# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

████████████████████

        Plaintiff,

                                      Civil Action No.: 3:25-cv-00013

v.

SHERRIE DANIELLE JOYNES, and            **JURY TRIAL DEMANDED**

STEPHANIE MORTON,

        Defendants.

## **COMPLAINT**

Plaintiff ████████████████ by counsel, moves this Court for Judgment against Defendants Sherrie Joynes and Stephanie Morton.

████████████ was brutally attacked while under the custody and control of the Virginia Department of Juvenile Justice ("DJJ"). As a resident (as the facility refers to them) at the Bon Air Juvenile Correctional Center ("Bon Air"), ████ was attacked by fellow residents in the office of a staff member at the facility, Sherrie Joynes, who just sat and watched the assault. Defendant Joynes did nothing to aid ████ while he was being attacked. In fact, Defendant Joynes was the one who summoned ████ to the crowded office where the attack occurred.

For the six months following the assault and resulting surgery, ████ was housed in the infirmary in conditions similar to solitary confinement. He was unable to meaningfully access the programs and services available to the children at Bon Air. He did not receive his mandated number

of phone calls, his recreation time was severely limited, and he had no access to educational services. He was effectively punished for being the victim of a brutal attack.

Throughout his detention in the infirmary, Defendant Morton, the Superintendent at Bon Air, knew about █████'s conditions of confinement and was indifferent to his suffering. Defendant Morton, as the Superintendent, had ultimate authority over █████'s housing. Yet she chose to keep him in isolation. █████ continues to suffer mental and emotional trauma from the attack, the surgery, and his extended confinement in solitary-like conditions.

## I.       JURISDICTION

1.       Jurisdiction exists in this case pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343. Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C.§ 1367(a), over the state law claims.

2.       Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

3.       Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this Division – specifically, in Chesterfield County.

## II.       PARTIES

4.       Plaintiff ███████████████████ is, and was at all relevant times, a resident of the Commonwealth of Virginia.

5.       At all times relevant hereto, Defendant SHERRIE DANIELLE JOYNES was a Community Coordinator with the Virginia Department of Juvenile Justice working within the

2

scope of her employment at the Bon Air Juvenile Correctional Center. Defendant Joynes is sued in her individual capacity.

6. At all times relevant hereto, Defendant STEPHANIE MORTON was an employee of the Virginia Department of Juvenile Justice serving as the Superintendent at Bon Air Juvenile Correctional Center. Defendant Morton is sued in her individual capacity.

## III. FACTS

7. ███████ has been held at Bon Air since May 2023.

8. Bon Air is a juvenile rehabilitative institution committed to providing residents with "quality education, treatment, and rehabilitation and re-entry supports," according to DJJ. Those held at Bon Air are referred to as "residents" by the staff there.

9. According to the Bon Air's Resident Handbook, residents have a right not to be subjected to "denial of appropriate services, programs, activities, and treatment."

**A. Defendant Joynes called ███ into her office, sat at her desk, and watched him be assaulted by other residents.**

10. The morning of August 1, 2023, ███ was called to the office of Defendant Community Coordinator Sherrie Joynes.

11. When he entered, he encountered a group of residents already in her office. Defendant Joynes was sitting behind her desk, looking at her phone. Defendant Joynes did nothing as residents began to taunt ███.

12. The assault quickly turned physical, with one resident putting his arms around ███ to restrain him while the others began to attack.

3

13. While the residents punched ███ in the face and body, Defendant Joynes continued to sit behind her desk, making no attempt to protect ███ from the assault herself or to call for assistance.

14. The attack continued for a while. By the end, ███ was bloody and unconscious.

15. When ███ came to, the attackers, at Defendant Joynes' instruction, changed ███'s bloody clothes, gave him a new shirt, and threw away his shirt and socks. They also tried to wipe the blood off his face.

16. Not only did Defendant Joynes not call for help, she prevented any help from arriving and intervening. While the attackers cleaned up after the assault, Defendant Joynes ensured that no Bon Air staff were able to access her office. As ███ finished wiping the blood from his face, a Bon Air staff member knocked on Defendant Joynes' office door. She quickly sent them away without providing an explanation.

17. Defendant Joynes then told ███ to leave the office and tossed a Honeybun at him on his way out.

18. According to residents interviewed after the incident, this was not the first assault facilitated by Defendant Joynes.

19. That afternoon, at 1:15 p.m., Dr. Ralston Mims, a clinical psychologist, came to Unit 64 to see ███ for individual therapy.

20. ███'s face showed the signs of his attack and Dr. Mims asked him about it. ███ informed him about the assault and told him that Defendant Joynes had taken no action to protect him. Dr. Mims later arranged for ███ to be taken to the medical department for an evaluation. Defendant Joynes never communicated with the medical department on ███'s behalf.

21. ███ was interviewed by a representative from DJJ and an investigation began.

4

22.      ████ needed a painful surgery on his nose to fix the fracture from the assault and the bruising around his eyes lasted for weeks, leaving him in severe pain.

**B.      Despite recovering from his injuries, ████ was held in the infirmary for six months without exercise, education, or socialization; he lived in solitary-like conditions.**

23.      Dr. Christopher Moon, the physician at Bon Air, initially ordered ████ to be admitted to the infirmary for injuries sustained by the assault. After ████'s surgery and post-operation follow-up, he experienced an unrelated episode of acute bronchitis on August 29. He was treated by Dr. Moon and had no issues thereafter.

24.      Yet, for six months following his assault—from August 2023 through February 2024—████ was held in the infirmary.

25.      The conditions he experienced in the infirmary amounted to quasi-solitary confinement, a punishment ████ received despite being the victim of the assault.

26.      According to DJJ, Bon Air ensures that each resident's schedule is "highly structured with planned interactive activities that teach life skills . . . [including] school, healthy recreation . . . and many different meetings and groups."

27.      Yet, during the six months ████ was held in the infirmary, he was not afforded most of the services promised to residents. He did not receive adequate recreation time, educational programming, or the mandated number of phone calls per week.

28.      ████ was left "in his room all day" and "not allowed to do anything." ████ consistently expressed to Dr. Mims and other on-call Behavorial Service Unit staff that he was experiencing negative physical, psychological, and emotional harms from the lack of any meaningful programming while in the infirmary. He wished to be put back on medication that made him groggy because he "no longer need[ed] to be alert for school in the mornings." He

5

expressed frustration with limited phone access on multiple occasions and was "lonely due to . . . limited phone access." Over the course of his first four months in the infirmary, Bon Air facilitated 12 phone calls on ████'s behalf. This averages less than one call per week, compared to the minimum four calls per week established in Bon Air's Resident Handbook.

29. Throughout his time in the infirmary, ████ was released from solitary-like conditions for recreational time on three occasions for 20 minutes each time—twice for physical recreation and once for a haircut. He was not allowed out of his room on Sundays, even though in his regular unit, ████ was typically let out for 45 minutes. When ████ was let out of his room for what Bon Air referred to as "Large Muscle Activity," it consisted of one hour or less, usually 30 minutes, of sitting in a chair watching TV by himself.

**C.** **Bon Air administrators were aware of the solitary-like conditions of ████'s confinement and elected to keep him there indefinitely in spite of his suffering and in contravention of DJJ policy.**

30. The administrative body responsible for managing ████'s housing situation was the Institutional Classification and Review Committee ("ICRC").

31. Over the course of ████'s hold in the infirmary, the ICRC met at least five times to discuss his housing status and to create a "Safety Plan."

32. Over the course of ████'s hold in the infirmary, Dr. Mims, a member of the ICRC, came to see him there at least 20 times. During his visits, ████ raised serious concerns over the daily conditions of confinement to which he was subjected.

6

33.     On August 10, 2023, the ICRC met to discuss ████s safety plan. The safety plan implied transferring ████ to another facility because the "Treatment Team [was to] follow up with alternative placements to include CPP[1] within the next two weeks."

34.     After voting on the plan, the ICRC forwarded it for approval to the Central Classification and Review Committee ("CCRC"). The CCRC is the DJJ administrative body responsible for approving case management decisions via referrals from the ICRC.

35.     In an action purportedly taken pursuant to a DJJ policy allowing for "emergency" transfers, on August 10, 2023, Defendant Superintendent Stephanie Morton approved the plan to keep ████ in the infirmary. She did so without approval from the CCRC.

36.     An outside report about Bon Air from Spring 2024 noted that during the onsite assessment period (January 30 – February 1, 2024), one resident "was housed in the infirmary for non-medical reasons" and had been there for a lengthy amount of time.

37.     As the Superintendent at Bon Air during the relevant time period, Defendant Morton had the supervisory authority over the administration and operation of the facility. Upon information and belief, such authority gave her the ability to remove ████ from the infirmary, or otherwise remedy the unconstitutional conditions he was being subject to, at any time during his stay.

38.     To this day, ████ continues to suffer mental and emotional trauma stemming from the assault, the injuries he suffered from it, and his prolonged confinement in the infirmary.

---

[1] A Community Placement Program ("CPP") is a residential facility that contracts with DJJ to hold some youths. *See* https://www.djj.virginia.gov/pages/ppi/cpp.htm.

## IV.    COUNTS

### COUNT I
### Gross Negligence
### (Against Defendant Joynes)

39.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

40.    Defendant Joynes owed affirmative duties to ████ .

41.    Defendant Joynes' actions and inactions, described in this Complaint, show such a level of indifference to ████ so as to constitute an utter disregard of prudence, amounting to a complete neglect for ████ 's safety.

42.    Additionally, the accumulation of Defendant Joynes' negligent acts demonstrate recklessness towards or total disregard for ████ .

43.    As a direct and proximate result of Defendant Joynes' gross negligence, ████ sustained the injuries and damages previously described in this Complaint.

44.    Defendant Joynes' gross negligence towards ████ 's safety establishes a cause of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

### COUNT II
### Willful and Wanton Negligence
### (Against Defendant Joynes)

45.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

46.    Defendant Joynes owed affirmative duties to ████ .

8

47. Defendant Joynes was willfully and wantonly negligent in that she acted, or failed to act, with conscious disregard for ████'s rights. Defendant Joynes' actions demonstrate her reckless indifference to the injuries that ████ sustained.

48. As a direct and proximate cause of Defendant Joynes' willful and wanton negligence, ████ suffered the severe injuries and damages outlined in this Complaint.

49. Defendant Joynes' willful and wanton negligence towards ████'s safety and security establishes a cause of action for monetary relief consisting of compensatory damages, punitive damages, and costs to the Plaintiff.

## COUNT III
### Failure to Protect
### Fourteenth Amendment (and, in the alternative, Eighth Amendment)[2] / 42 U.S.C. § 1983
### (Against Defendant Joynes)

50. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

51. Defendant Joynes, at all times acting under color of state law and in her individual capacity, deprived ████████ of his constitutionally protected rights under the Fourteenth (or Eighth) Amendment of the United States Constitution by acting with deliberate indifference to a known risk of serious bodily harm.

52. As an employee of Bon Air, Defendant Joynes owed all residents, including ████, an affirmative duty of care.

---

[2] It is Plaintiff's contention that as a juvenile committed for rehabilitation purposes, his federal civil rights claims (Counts III and IV) related to his detention are properly analyzed under the Fourteenth Amendment Due Process Clause and the professional judgment standard set out by the Supreme Court in *Youngberg v. Romero*, 457 U.S. 307 (1982). However, if the Court rules otherwise, Plaintiff in the alternative brings Counts III and IV under the Eighth Amendment standard for convicted prisoners and/or the Fourteenth Amendment standard for detainees.

9

53.     Defendant Joynes knew or should have known that the group of residents in her office may attack ███, and she knew unequivocally that ███ was at risk of serious bodily harm during the attack. Yet Defendant Joynes took no action to protect ███; in fact, she actively prevented his protection, exhibiting a severe deviation from the standards of professional judgment (or, in the alternative, deliberate indifference to the known risk of the attack and subsequent injury).

54.     As a direct and proximate result of Defendant Joynes' deviation from the standards of professional judgment (or deliberate indifference), ███ was injured in various respects, including, without limitation, suffering physical injuries, pain and suffering, and severe mental anguish and trauma due to Joynes' egregious failure to take any action to protect him.

55.     All the injuries detailed in this Complaint are attributable to the deprivation of ███'s constitutional rights guaranteed by the Fourteenth (or Eighth) Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

56.     Defendant Joynes' violation of the Fourteenth (or Eighth) Amendment to the U.S. Constitution establishes a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages, punitive damages, attorneys' fees, and costs to the Plaintiff.

## COUNT IV
### Conditions of Confinement
### Fourteenth Amendment (and, in the alternative, Eighth Amendment) / 42 U.S.C. § 1983
### (Against Defendant Morton)

57.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

58.     Defendant Morton, acting under color of state law, deprived ███ of his constitutionally protected rights under the Fourteenth (or Eighth) Amendment of the United States

10

Constitution by violating her affirmative duties to provide him with constitutionally adequate conditions of confinement.

59.     The Fourteenth Amendment to the U.S. Constitution creates affirmative duties for administrators in a rehabilitative setting, such as Bon Air, to provide reasonable, safe conditions of confinement.

60.     By holding ███ in the infirmary for six months and maintaining an abject lack of meaningful services, Defendant Morton abdicated her duty to ███ in a manner completely inconsistent with the standard of professional judgment typical of someone in her position in juvenile rehabilitation.

61.     In the alternative, Plaintiff alleges that Defendant Morton was aware of the serious risk of harm to Plaintiff from holding him in the infirmary for an extended period of time but responded to that knowledge with deliberate indifference.

62.     As a direct and proximate result of Defendant Morton's serious deviation from the standards of professional judgment (or deliberate indifference) with respect to her decision to hold ███ in the infirmary, ███ was injured in various respects, including, without limitation, suffering physical injuries, pain and suffering, and severe mental anguish and trauma.

63.     Defendant Morton's violation of the Fourteenth (or Eighth) Amendment to the U.S. Constitution establishes a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages, punitive damages, attorneys' fees, and costs to the Plaintiff.

**V.      JURY TRIAL DEMANDED**

64.     Plaintiff demands that all issues of fact of this case be tried to a properly impaneled jury to the extent permitted under the law.

11

## VI.    PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants Sherrie Joynes and Stephanie Morton in the amount of $500,000, or a greater amount to be determined at trial, as well as costs (including attorneys' fees for the federal civil rights claims), and grant such other and further relief that the Court may deem appropriate.

Respectfully submitted,

By:_____/s/ Danny Zemel____
         Counsel

Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Email: dzemel@krudys.com

*Counsel for Plaintiff* █████████████