**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

CALEB MICHAEL DUDLEY,
        Plaintiff,

v.                                      CIVIL ACTION NO. 3:25cv13

DANIELLE JOYNES and STEPHANIE MORTON,
        Defendant.

**MEMORANDUM IN SUPPORT OF DEFENDANT STEPHANIE MORTON'S MOTION TO DISMISS**

      COMES NOW, Defendant, STEPHANIE MORTON, and for her Memorandum in Support of her Motion to Dismiss provides as follows:

## I.      PRELIMINARY STATEMENT

      Plaintiff Caleb Michael Dudley filed a lawsuit against Defendant Stephanie Morton ("Morton" or "Defendant")[1] pursuant to 42 U.S.C. § 1983 contending that Morton violated his Eighth Amendment rights by agreeing to his placement in the infirmary at Bon Air Juvenile Correctional Center ("Bon Air") for six months and therefore subjecting him to cruel and unusual punishment. *See generally* Complaint ("Compl." or "ECF No. 5"). Dudley seeks monetary damages in the amount of $500,000 as well as his court costs. Compl. at p. 12, ¶ VI.

## II.      PARTIES

      1.      Plaintiff, Caleb Michael Dudley ("Plaintiff" and "Dudley") is, and was at all times relevant to the allegations in the Complaint, a resident of the Commonwealth of Virginia. Compl. at p. 2, ¶ 4. The contentions in the Complaint arose while Dudley was under the custody

---

[1] Plaintiff also sues Defendant Danielle Joynes. The Office of the Attorney General does not represent Ms. Joynes and therefore will not address the claims lodged against her in the Motion to Dismiss.

and control of the Virginia Department of Juvenile Justice ("DJJ") as a resident of Bon Air

Juvenile Correctional Center ("Bon Air").  Compl. at p. 1.

2.      At all times relevant to the allegations in the Complaint, Defendant Sherrie

Danielle Joynes ("Joynes") was a Community Coordinator with DJJ.  Compl. at pp. 2-3, ¶ 5.

3.      At all times relevant to the allegations in the Complaint, Defendant Stephanie

Morton ("Defendant" or "Morton") served as an employee of DJJ and specifically as the

Superintendent at Bon Air Juvenile Correctional Center.  Compl. at p. 3, ¶ 6.

### III.    MATERIAL STATEMENTS OF FACT

Without accepting or adopting any of the allegations in Dudley's Complaint as true,

Morton provides the following material statements of fact *related to the claim against her* as set

forth by the Plaintiff for purposes of evaluating the Motion to Dismiss:

1.      Plaintiff Dudley has been held at Bon Air since May 2023.  Compl. at p. 3, ¶ 7.

2.      Bon Air is a juvenile rehabilitative institution committed to providing residents

with "quality education, treatment, and rehabilitation and re-entry supports."  *Id.* at ¶ 8.

3.      The Bon Air's Resident Handbook states that residents have a right not to be

subjected to "denial of appropriate services, programs, activities, and treatment."  *Id.* at ¶ 9.

4.      On the morning of August 1, 2023, Dudley was assaulted by a group of other Bon

Air residents in the office of Defendant Community Coordinator Sherrie Joynes.  *Id.* at pp. 3-4,

¶¶ 10-13.

5.      By the end of the attack, Caleb was bloody and unconscious.  *Id.* at p. 4, ¶ 14.

6.      Joynes instructed the attackers to change Caleb's bloody clothes, provide him with

a new shirt, throw away his shirt and socks, and wipe the blood from his face.  *Id.* at ¶ 15.

7.      Joynes did not call for help and prevented any help from arriving and intervening. Joynes ensured that no Bon Air staff were able to access her office. Joynes sent a staff member away without providing an explanation. *Id.* at ¶ 16.

8.      Dr. Ralston Mims, a clinical psychologist, "later" arranged for Dudley to be taken to the medical department for an evaluation. *Id.* at ¶ 20.

9.      Dudley needed a painful surgery on his nose to fix the fracture from the assault; \ the bruising around his eyes lasted for weeks and left him in severe pain. *Id.* at p. 5, ¶ 22.

10.     Dr. Christopher Moon, the physician at Bon Air, initially ordered Dudley to be admitted to the infirmary for injuries sustained by the assault. *Id.* at ¶ 23. After Dudley's surgery and post-operation follow-up, he experienced an unrelated episode of acute bronchitis on August 29. *Id.* He was treated by Dr. Moon and sustained no issues thereafter. *Id.* at ¶ 23.

11.     Dudley stayed in the infirmary at Bon Air from August 2023 through February 2024. *Id.* at ¶ 24.

12.     Dudley's experience in the infirmary "amounted to quasi-solitary confinement." *Id.* at ¶ 25.

13.     The Department of Juvenile Justice provides that Bon Air ensures each resident's schedule is "highly structured with planned interactive activities that teach life skills ...[including] school, healthy recreation ... and many different meetings and groups." *Id.* at ¶ 26.

14.     During the six months Dudley was in the infirmary, he was not provided "most of the services promised to residents" nor did he receive "adequate recreation time, educational programming, or the mandated number of phone calls per week." *Id.* at ¶ 27.

15.     Dudley stayed "in his room all day" and was not permitted "to do anything." *Id.* at pp. 5-6, ¶ 28. Dudley expressed to Dr. Mims and other on-call Behavioral Service Unit staff

that he "experience[ed] negative physical, psychological, and emotional harms from the lack of any meaningful programming while in the infirmary. He wished to be put back on medication that made him groggy because he "no longer need[ed] to be alert for school in the mornings." *Id.*

16. Dudley expressed frustration with limited phone access on multiple occasions and was "lonely due to...limited phone access." During his first four months in the infirmary, Bon Air facilitated 12 phone calls on Caleb's behalf, which is less than the minimum four calls per week established in Bon Air's Resident Handbook. *Id.*

17. Dudley was released for recreational time on three occasions for 20 minutes each time-twice for physical recreation and once for a haircut. *Id.* at p. 6, ¶ 29.

18. Additionally, Dudley was let out of his room for "Large Muscle Activity," consisting of one hour or less, usually consisting of thirty minutes of sitting in a chair watching TV by himself. *Id.* He was not allowed out of his room on Sundays; in his regular unit, Dudley was typically let out for 45 minutes on Sundays. *Id.*

19. The Institutional Classification and Review Committee ("ICRC") is the administrative body responsible for managing Dudley's housing situation. *Id.* at p. 6, ¶ 30.

20. During Dudley's time in the infirmary, the ICRC met at least five times to discuss his housing status and to create a "Safety Plan." *Id.* at ¶ 31.

21. During Dudley's time in the infirmary, Dr. Mims, a member of the ICRC, came to see him there at least twenty times. *Id.* at ¶ 32. During such visits, Dudley "raised serious concerns over the daily conditions of confinement to which he was subjected." *Id.*

22. The ICRC met on August 10, 2023, to discuss Dudley's safety plan, which suggested transferring Caleb to another facility because the "Treatment Team [was to] follow up with alternative placements to include CPP1 within the next two weeks." *Id.* at p. 7, ¶ 33.

23.    After voting on the safety plan, the ICRC forwarded it for approval to the Central Classification and Review Committee ("CCRC"), which is the administrative body responsible for approving case management decisions via referrals from the ICRC within DJJ.  *Id.* at ¶ 34.

24.    On August 10, 2023, Defendant Superintendent Morton approved the plan to keep Dudley in the infirmary pursuant to a DJJ policy allowing for emergency transfers, on August 10, 2023.  *Id.* at ¶ 35.  She did so without approval from the CCRC.  *Id.*

25.    An outside report regarding Bon Air from Spring 2024 stated that during the onsite assessment period of January 30- February 1, 2024, one resident "was housed in the infirmary for non-medical reasons" and had been there for some time.  *Id.* at ¶ 36.

26.    As the Superintendent at Bon Air during the relevant time period," Morton possessed the supervisory authority over the administration and operation of the facility."  *Id.* at ¶ 37.  "Upon information and belief, such authority gave her the ability to remove [Dudley] from the infirmary or otherwise remedy his [living] conditions. . . ."  *Id.*

27.    Dudley "continues to suffer mental and emotional trauma stemming from the assault, the injuries he suffered from it, and his prolonged confinement in the infirmary."  *Id.* at ¶ 38.

28.    Caleb was injured in various respects due to his stay in the infirmary, including, "without limitation, suffering physical injuries, pain and suffering, and severe mental anguish and trauma."  Compl. at p. 11, ¶ 62.

## IV.    CLAIMS

Morton interprets Dudley's Complaint as making the following claim against her:

1.    Morton subjected Dudley to cruel and unusual conditions of confinement in violation of the Eighth Amendment related to his placement in the infirmary at Bon Air for approximately six months.  Compl. pp. 10-11, ¶¶ 57-63.

Dudley also refers to an alternative claim against Morton under the Fourteenth Amendment, citing a standard set forth in *Youngberg v. Romero,* 457 U.S. 307 (1982).  Compl. at p. 9, n.2; pp. 10-11, ¶¶ 57-63.  However, it is Defendant's position that such standard does not apply here because that case involved the civil commitment of an involuntarily committed intellectually disabled person.  Commitment to the Department of Juvenile Justice, on the other hand, follows adjudication of a delinquent (criminal) act.  *See* Va. Code § 16.1-278.7; Va. Code § 16.1-228 ("'Delinquent act' means (i) an act designated a crime under the law of the Commonwealth, or an ordinance of any city, county, town, or service district, or under federal law, (ii) a violation of § 18.2-308.7, or (iii) a violation of a court order as provided for in § 16.1-292, but does not include an act other than a violation of § 18.2-308.7, which is otherwise lawful, but is designated a crime only if committed by a child.").  Defendant submits that Dudley's allegations against Morton should be evaluated under the Eighth Amendment; indeed, Eighth Amendment analyses have been employed in past cases involving Department of Juvenile Justice facilities.  *See Coleman v. Va. Dep't of Corr.*, 2023 U.S. Dist. LEXIS 240739, *8 (E.D. Va. 2023) ("Turning to the present case, Plaintiff states a valid claim for relief under § 1983 for Defendant's Eighth Amendment violation against Plaintiff. Defendant was employed and on duty as a corrections officer at the time of the attack at Beaumont [a DJJ facility], therefore he was acting under color of state law."); *Blankenship v. Virginia*, 432 F. Supp. 2d 607, 2006 U.S. Dist.

LEXIS 32134 (E.D. Va. 2006).  To the extent the Court believes the Fourteenth Amendment applies, Defendant Morton respectfully requests leave to file a supplemental brief on that issue.

## V.    <u>STANDARD OF REVIEW</u>

"[T]he purpose of Rule 12(b)(6) is to test the legal sufficiency of the complaint." *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible if the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and if there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombley*, 550 U.S. at 556); *see also* Fed. R. Civ. P. (8)(a)(2); *Francis v. Giacomelli*, 588 F.3d 186 (4th Cir. 2009)).  To survive a motion to dismiss for failure to state a claim, the plaintiff must assert "facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002)); *see also Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002). However, although the Court must deem all of the factual allegations set forth in an initial pleading as true, the Court is not bound to accept a legal conclusion couched as a factual assertion, *Iqbal*, 556 U.S. at 663-64, nor should the Court accept a plaintiff's "unwarranted deductions," "rootless conclusions of law," or "sweeping legal conclusions cast in the form of factual allegations." *Custer v. Sweeney*, 89 F.3d 1156, 1163 (4th Cir. 1996).

# VI.    AUTHORITY AND ARGUMENT

### 1. DUDLEY DOES NOT PROPERLY ASSERT AN EIGHTH AMENDMENT VIOLATION AGAINST MORTON RELATED TO HIS CONDITIONS OF CONFINEMENT.

The Court should dismiss Count IV of the Complaint, which is Dudley's Eighth Amendment claim against Morton related to Dudley's conditions of confinement because Dudley fails to meet the requisite elements of such a cause of action. Dudley contends that Morton's purported "holding [of] Caleb in the infirmary for six months and maintaining an abject lack of meaningful services" amounted to an Eighth Amendment violation. Compl. at p. 11, ¶ 60. The Eighth Amendment "provides protection with respect to 'the treatment a prisoner receives in prison and the conditions under which he is confined.'" *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (quoting *Helling v. McKinney*, 509 U.S. 25, 31, 125 L. Ed. 2d 22, 113 S. Ct. 2475 (1993)). The Eighth Amendment forbids conditions of confinement attributed to a prison official's "deliberate indifference" to an inmate's health or safety because in such situations, the official has inflicted cruel and unusual punishment on the prisoner. *Estelle v. Gamble*, 429 U. S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); *Wilson v. Seiter*, 501 U. S. 294, 299, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991). To properly state an Eighth Amendment claim, an inmate must allege facts establishing "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)); *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2019) ("The Eighth Amendment inquiry proceeds in two parts: whether confinement conditions inflict harm that is, 'objectively, sufficiently serious' to deprive prisoners of 'the minimal civilized measure of life's necessities' and whether officers subjectively acted with

'deliberate indifference to inmate health or safety' because they knew of but disregarded the inhumane treatment.").

### A. Dudley fails to properly meet the requirements of the "objective" factor of an Eighth Amendment Constitutional violation.

The Eighth Amendment claim against Morton should be dismissed because Dudley fails to meet the "objective" prong of the analysis.  Under the first, "objective," prong, an inmate plaintiff must allege facts to suggest that the deprivation complained of was "extreme" and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).  "In order to demonstrate such an extreme deprivation, a prisoner must allege 'a serious or significant physical or emotional injury resulting from the challenged conditions.'" *De'Lonta*, 330 F.3d at 634 (quoting *Strickler*, 989 F.2d at 1381).  This first objective factor measures the harm (or the risk thereof) named correctional conditions impose on plaintiffs and whether such characteristics indeed "resulted in unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Plaintiffs must only demonstrate the circumstances are "objectively harmful enough." *Hudson*, 503 U.S. at 8 (cleaned up); *see also Wilson*, 501 U.S. at 298.  Put another way, the Eighth Amendment asks whether certain characteristics of confinement *inflict harm* that proves "objectively, sufficiently serious to deprive a prisoner of minimal civilized necessities." *Farmer*, 511 U.S. at 834.

Here, Plaintiff's Eighth Amendment claims against the Defendant initially fail under the objective prong of the Eighth Amendment's analysis because Dudley's conditions in the infirmary were not sufficiently serious, and the Plaintiff does not allege that he suffered "a serious or significant physical or emotional injury" as a result of the alleged conditions.

*De'Lonta*, 330 F.3d at 634.  Dudley contends that the physician at Bon Air required his placement in the infirmary for injuries sustained by the assault. Compl. at p. 5, ¶ 23.  After his surgery and post-operation follow-up, he experienced an unrelated episode of acute bronchitis on August 29, 2023; he was treated by Dr. Moon and had no issues thereafter.  *Id.*  Dudley claims he did not receive "adequate recreation time, educational programming, or the 'mandated' number of phone calls per week."  *Id.* at p. 5, ¶ 27.  He stayed "in his room all day" and was not permitted "to do anything."  *Id.* at ¶ 28.  During his first four months in the infirmary, Bon Air facilitated 12 phone calls on Dudley's behalf.  *Id.*  He was released for recreational time on three occasions for 20 minutes each time-twice for physical recreation and once for a haircut.  *Id.* at p. 6, ¶ 29.  Additionally, although he was not allowed out of his room on Sundays, it is implied that he was let out of his room on all other days for an hour or less.  *Id.*  He was permitted to watch television and frequently received visitors, including his psychologist.  *Id.* at p. 6, ¶¶ 29, 32.

Dudley's allegations are insufficient as a matter of law to state an Eighth Amendment claim. Dudley never contends his accommodations in the infirmary were unsanitary.  *See DePaola v. Ray*, No. 7:12CV00139, 2013 WL 4451236, at *10 (W.D. Va. July 22, 2013) (finding that the plaintiff's claim that he "suffered from nausea [and psychological trauma] due to the smell of other prisoners smearing their feces/urine" did not demonstrate a violation of a basic human need or a sufficiently serious or significant injury), *R&R adopted*, 2013 WL 4453422 (W.D. Va. Aug. 16, 2013); *Belfield v. Stolle*, No. 3:13cv234, 2015 U.S. Dist. LEXIS 44260, 2015 WL 1526212, at *3 (E.D. Va. Apr. 3, 2015) (finding that a plaintiff who alleged that his food trays "arrive[d] [w]ith bugs on the trays from the kitchen every morning" failed to state an Eighth Amendment claim upon which relief could be granted).

Dudley never claims he lacked adequate food, clothing, shelter, or medical care while in the infirmary. *See Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) ("[T]he Eighth Amendment imposes a duty on prison officials to 'provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care.")  (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  He does not insinuate that the area where he was kept was tiny or dark. *See e.g.*, *Porter v. Clarke*, 923 F.3d 348, 353 (4th Cir. 2019) (describing the cells on death row as roughly one-half the size of a parking space).  He does not allege "a low cell temperature at night combined with a failure to issue blankets." *See e.g.*, *Wilson*, 501 U.S. at 304.  He does not imply that the infirmary was overcrowded or unsanitary, that it was dangerous in any way, or that he suffered harassment from other inmates while there. *See e.g.*, *Williams v. Griffin*, 952 F.2d 820, 824 (4th Cir. 1991).  He does not suggest "inadequate ventilation." *See e.g.*, *Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir.1990).  He does not aver that he was denied showers or basic hygiene. *See Hite v. Leeke*, 564 F.2d 670, 672 (4th Cir. 1977) ("the deprivation of the basic elements of hygiene" violates the Eighth Amendment).

Dudley also doesn't claim he experienced "prolonged periods of isolation."  He suggests no permanent ban on visitors and in fact submits that he was able to receive them at the infirmary. *See* Compl. at p. 6, ¶ 32.  And, even if there was a temporary ban of his visitation privileges—such withdrawal of visitors for as long as two years fails to "create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety. Nor does it involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur." *Diggs v. Johnson*, 2024 U.S. Dist. LEXIS 201160, *8 (W.D. Va. Nov. 5, 2024) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 137 (2003)).  Similarly, Dudley's purportedly limited

telephone calls do not state a cause of action based on the Eighth Amendment—even a permanent ban of telephone privileges would not arise to such a violation. *Diggs v. Johnson*, 2024 U.S. Dist. LEXIS 201160, at \*8-9; *Thomas v. Drew*, 365 F. App'x 485, 488 (4th Cir. 2010) (finding that an inmate failed to demonstrate that a permanent ban on his telephone privileges violated the Eighth Amendment). Dudley also never contends that there were no other residents in the infirmary, or that he was unable to speak and engage with others while there.

Dudley avers he did not receive educational programming. Compl. at p. 5, ¶ 27. However, inmates have no constitutional right to rehabilitative or educational programming while in prison. *See Bowring v. Godwin*, 551 F.2d 44, 48 n. 2 (4th Cir. 1977); *Quarles v. Dillman*, 2011 U.S. Dist. LEXIS 52266, 2011 WL 1869961, \*2 (W.D. Va. May 16, 2011) ("[I]nmates have no constitutional right to job or educational opportunities while incarcerated."). Dudley notably never suggests that he was a juvenile at any point during the period of August 2023-February 2024; thus, he cannot argue his education was compulsory as it would be for someone under the age of eighteen. *See* Va. Code § 22.1-254(A), *Compulsory attendance required; excuses and waivers; alternative education program attendance; exemptions from article* ("The requirements of this section shall apply to (i) any child in the custody of the Department of Juvenile Justice or the Department of Corrections who has not passed his eighteenth birthday"); *see also* Va. Code § § 16.1-285.1(C) (providing that juveniles may be committed to DJJ up until the age of twenty-one).

As for his purported lack of exercise—Dudley never indicates that he was deprived of all exercise—in fact, he specifies he was permitted outside of his room at the infirmary on every day but Sunday for "Large Muscle Activity" in addition to receiving a couple of sessions of presumably outdoor physical recreation. *See* Compl. at p. 6, ¶ 29. And, "'isolation from

companionship,' 'restriction on intellectual stimulation and prolonged inactivity,' inescapable accompaniments of segregated confinement, will not render segregated confinement unconstitutional absent other illegitimate deprivations."). *See Sweet v. South Carolina Dep't of Corrections,* 529 F.2d 854, 861 (4th Cir. 1975).

Dudley also fails to provide evidence of "a serious or significant physical or emotional injury" due to his placement in the infirmary as is required in the objective element of an Eighth Amendment assessment. *See Strickler*, 989 F.2d at 1381 (The Court should assess whether the prisoner has "come forward with . . . *evidence* that he has sustained . . . significant physical or emotional injury as a result of" solitary-confinement conditions.") (emphasis added); *see also Sweet v. South Carolina Dep't of Corrections,* 529 F.2d 854, 861 (4th Cir. 1975). Dudley pleads that he suffered injuries *from the assault itself*—specifically, a fractured nose and severe bruising, however, he never defines what alleged harm he experienced from his six months in the medical ward. Compl. at p. 5, ¶ 22. He provides only generally that because of his placement in the infirmary "[he] was injured in various respects, including, without limitation, suffering physical injuries, pain and suffering, and severe mental anguish and trauma." Compl. at p. 11, ¶ 62; *see also* Compl. at pp. 5-6 ¶ 28 (Dudley "experience[ed] negative physical, psychological, and emotional harms from the lack of any meaningful programming while in the infirmary" and was "lonely due to...limited phone access."). Moreover, he makes merely a general claim that "[h]e wished" to again take medication that made him tired because he "no longer need[ed] to be alert for school in the mornings," but never explains if he actually restarted the medication or if it harmed him in any way. *Id.* at pp. 5-6, ¶ 28. These formulaic allegations do not sufficiently plead the subjective component of an Eighth Amendment conditions of confinement analysis. *Williams v. Gilbert*, 2024 U.S. Dist. LEXIS 15230, *9 (W.D. Va. Jan. 29, 2024) (in analyzing an

attempted Eighth Amendment claim, the Court stated "Williams does not allege any sort of injury from missing two meals, and his formulaic statement that this caused him 'pain, suffering, physical injury, and emotional distress' is insufficient to state a plausible claim."); *see Webb v. McKnight*, 2006 WL 3761382 (W.D. Va. Dec. 20, 2006) (holding that a prisoner failed to state an Eighth Amendment claim because the injuries of which he complained – indigestion, constipation, headaches, occasional vomiting, and emotional distress – were not sufficiently serious), *aff'd*, 225 F. App'x 117 (4th Cir. 2007). Moreover, Dudley never demonstrates how his challenged conditions of confinement created a "substantial risk" of serious psychological and emotional harm. *See Porter v. Clarke*, 923 F.3d 348, 361 (4th Cir. 2019); *see Sweet v. South Carolina Dep't of Corrections,* 529 F.2d 854 (4th Cir. 1975). Thus, he fails to meet the objective requirement of an Eighth Amendment violation.

### B. Dudley fails to meet the "subjective" prong of a cognizable Eighth Amendment cause of action.

Moreover, even if the Court were to find that Dudley satisfied the objective prong of the Eighth Amendment analysis, he does not establish the second "subjective" component of an Eighth Amendment claim challenging the conditions of confinement as to Morton. "[I]n cases challenging conditions of confinement. . . that [sufficiently culpable] state of mind must be at least 'deliberate indifference' to the inmate's 'health or safety.'" *Ford v. Hooks,* 108 F.4th 224, 230 (4th Cir. 2024) (citations omitted); *De'Lonta v. Angelone*, 330 F.3d at 634 (This element "is satisfied by a showing of deliberate indifference by prison officials."); *see Farmer v. Brennan*, 511 U.S. 825, 834-35, 837 (1994) ("Deliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. It requires that a prison official actually

know of and disregard an objectively serious condition, medical need, or risk of harm.") (internal citations omitted).

"Deliberate indifference is a very high standard"; establishment of mere negligence is not enough.  *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) (quoting *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999)).  "Deliberate indifference" equates to a *culpable mens rea*; a plaintiff must prove that the prison official "subjectively 'knew' of the substantial risk of harm to a prisoner and 'consciously disregarded' it, thus incorporating the concept of criminal recklessness as defined in the Model Penal Code."  *Ford*, 108 F.4th at 230; *see Farmer*, 511 U.S. at 834, 837 (The Eighth Amendment prohibits only intentional conduct: a minimum of "'deliberate indifference' to inmate health or safety" is required. . . correction officers "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and actually "draw the inference" before liability attaches).  A plaintiff may meet these requirements by "prov[ing] by circumstantial evidence that a risk was so obvious that it had to have been known."  *Makdessi v. Fields*, 789 F.3d 126, 136 (4th Cir. 2015)); *Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir. 2011) ("[a]n obvious risk of harm justifies an inference that a prison official subjectively disregarded a substantial risk of serious harm to the inmate.").

Thus, Dudley must demonstrate that "'(1) [Morton] subjectively recognized a substantial risk of harm' and (2) that [Morton] also 'subjectively recognized' that any actions [she] took in response 'were inappropriate in light of that risk.'"  *Id.* (quoting *Parrish*, 372 F.3d at 303).  It is not sufficient that Morton "*should have* recognized the risk and the inadequacy of [the] response"; rather, she needed to actually perceive both.  *Ford*, 108 F.4th at 230.  Here, Dudley, by his own admission, was placed in the infirmary after surgery on a medical order, and remained there when suffering acute bronchitis at the end of August 2023.  Compl. at p. 5, ¶ 23.

He could leave his room and was permitted to watch television, allowed ample visitation, and could make telephone calls.[2]  Compl. at pp. 5-6, ¶¶ 28-29. Moreover, he alleges only that Morton decided to keep him in the infirmary on August 10, 2023, a few days after he was attacked and presumably received surgery, for an emergency purpose.  Compl. at p. 7, ¶ 35.  He does not include any additional specific facts related to Morton's involvement with his case over the next six months in his being kept in the infirmary after receiving the surgery other than the "information and belief" that she possessed the "authority" to remove Caleb from the infirmary, or otherwise remedy [the situation]."  Compl. at p. 7, ¶ 27.  Even so, it cannot be said that Morton disregarded Dudley's health and safety.  Indeed, it can be inferred from Dudley's own pleading that the placement in the infirmary in fact *protected* Dudley's health and safety— particularly given that he was apparently assaulted and ambushed by several residents on August 1, 2023; sustained a fractured nose, bruising around his eyes which lasted several weeks, and "severe pain"; underwent surgery and post-operative recovery; and battled bronchitis at the end of August 2023.  *See* Compl. at pp. 3-5, ¶¶ 10-23.  Moreover, the subsequent "safety plan"; the "'emergency' transfer" on August 10, 2023; and the fact that Dudley was apparently targeted by other residents indicate that a continued placement in the infirmary was appropriate and in fact may have been designed to protect him and keep him insulated from those residents who targeted him.  Compl. at p. 3, ¶ 11; p. 7, ¶¶ 33-35.  And, although Defendant does not agree that Dudley's placement was in any way akin to solitary confinement, "prison officials tasked with the difficult

---

[2] Dudley makes references to the fact that for a portion of his time in the infirmary, he received less telephone calls than he should according to the Resident Handbook.  Compl. at p. 6, ¶ 28.  However, there is no constitutional issue when a state fails to adhere to its own procedural regulations.  *See Shan Gilmore*, 2010 U.S. Dist. LEXIS 26123, at *6; *see also Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) ("[P]rison officials' failure to follow internal prison policies [is] not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation."); *Riccio v. County of Fairfax. Va.*, 907 F.2d 1459, 1469 (4th Cir. 1990) (holding that if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue).

task of operating a detention center may reasonably determine that prolonged solitary detention of the inmate is necessary to protect the well-being of prison employees, inmates, and the public or to serve some other legitimate penological objective." *Porter*, 923 F.3d at 363; *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326, 132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012) ("The difficulties of operating a detention center must not be underestimated by the courts.").

The Complaint states only in a conclusory fashion that "Morton was aware of the serious risk of harm to Plaintiff from holding him in the infirmary for an extended period of time but responded to that knowledge with deliberate indifference." Compl. at p. 11, ¶ 61. However, there are no facts produced that support this conclusory statement and therefore Dudley does not proffer evidence of a culpable mind as to Morton. Dudley never indicates that Morton was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and actually "[drew] the inference." The Complaint alleges only generally that Dudley has suffered from "physical injuries, pain and suffering, and severe mental anguish and trauma," but includes no additional details regarding his purported mental and physical injuries. Compl. at p. 11, ¶ 62. Moreover, Dudley never suggests that Morton ever actually encountered Dudley, met him, spoke with him, or knew by any other manner that Dudley was purportedly suffering such harm. Thus, it cannot be said that Morton was aware of any issues Dudley apparently experienced, nor that she could have "draw[n] the inference" that confining Dudley in the infirmary caused those harms. *See Farmer*, 511 U.S. at 837. She therefore was not "deliberately indifferent."

Thus, any Eighth Amendment claim against Morton should be dismissed.

2. **DEFENDANT MORTON IS ENTITLED TO QUALIFIED IMMUNITY.**

Morton is entitled to qualified immunity regarding the contentions related to Dudley's conditions of confinement. Qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly establish statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Evaluating a claim of qualified immunity involves a two-part test: (1) do the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) did the actions violate a clearly established right of which a reasonable person would have known?" *Trail v. Cressell*, 494 F. Supp. 3d 349, 357 (W.D. Va. 2020); *see also Pearson v. Callahan*, 555 U.S. 223, 227, 129 S. Ct. 808 (2009). A defendant can be protected by qualified immunity if the entitlement appears on "the face of the complaint." *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011).

Qualified immunity at its core involves whether the officer possessed "fair notice." *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002). It insulates a state actor "from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Taylor v. Riojas*, 141 S. Ct. 52, 53, 208 L. Ed. 2d 164 (2020) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (*per curiam*)). The doctrine only goes as far as "the interest it protects"; it does not protect a prison official's "discretion that amount[s] to reckless or callous indifference to the rights and safety of the prisoners." *Smith v. Wade*, 461 U.S. 30, 55, 103 S. Ct. 1625, 75 L. Ed. 2d 632 (1983). It does not insulate "those who knowingly violate the law." *See Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (when "plaintiffs have made a showing sufficient

to" demonstrate an intentional violation of the Eighth Amendment, "they have also made a showing sufficient to overcome any claim to qualified immunity.")

Morton first asserts that Dudley's Eighth Amendment rights related to his placement in the infirmary were never violated, thereby satisfying the first factor of qualified immunity. However, even if the Court finds that Dudley did indeed assert a constitutional violation, Morton is still entitled to qualified immunity because in August 2023 through February 2024, case law did not clearly establish that placing an adult in the infirmary under the conditions Dudley complains of would cause severe enough harm to implicate the Eighth Amendment. Here, Dudley alleges that Morton deliberately exposed him to "quasi-solitary" conditions of confinement—mainly minimal official recreation time, limited phone calls, no educational programming, and a substantial amount of television viewing. *See* Compl. at pp. 5-6, ¶¶ 27-29. However, as described previously herein, it remains clear that at the time of the purported events in Dudley's Complaint, those allegations did not arise to constitutional violations without more.

Moreover, Dudley never suggests that Morton possessed actual knowledge of his "prolonged" placement. *See Harlow v. Fitzgerald*, 457 U.S. 800, 821, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (Brennan, J., concurring) (Qualified immunity does "not allow the official who *actually* knows that he was violating the law to escape liability for his actions."). Here, Dudley only alleges Morton was involved in Dudley's placement in the medical ward a few days after the assault when "on August 10, 2023, [she allegedly] approved the plan to keep [Dudley] in the infirmary." Compl. at p. 7, ¶ 35. Dudley then merely avers in a conclusory fashion that Morton possessed "the supervisory authority over the administration and operation of the facility," and that she could have remedied Dudley's circumstances, without providing more. Compl. at p. 7, ¶ 37. It would not have been generally obvious to Morton that Dudley's

placement in the infirmary violated constitutional law, and Dudley fails to provide concrete facts indicating Morton's involvement in Dudley's placement in the medical ward outside of the August 10, 2023, decision.  Dudley never claims she visited him, spoke with him, or received updates on him.  The Complaint also never suggests that Morton was aware of other situations where residents were placed in the infirmary and suffered harm.  Thus, Morton is entitled to qualified immunity and the Eighth Amendment claim should also be dismissed on those grounds.

### 3. MORTON SHOULD NOT BE HELD LIABLE BASED ONLY ON HER POSITION AS A SUPERVISOR.

Finally, to the extent Dudley is trying to hold Morton liable due to her position as a superintendent, all claims against her, including Count IV, should be dismissed.  To properly state a claim under 42 U.S.C. § 1983, the plaintiff must show direct personal involvement by each particular defendant.  *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (noting that liability in a civil rights case is "personal, based upon each defendant's own constitutional violations"); *see also Sullivan v. Younce*, 2017 U.S. Dist. LEXIS 23150, at *15-18 (E.D. Va. Feb. 16, 2017) (where the inmate failed to state a claim against certain defendants where he did not allege that any of them were personally involved in the alleged deprivation of his constitutional rights); *Calvary Christian Ctr. v. City of Fredericksburg*, 832 F. Supp. 2d 635, 642 (E.D. Va. 2011) (granting a 12(b)(6) motion to dismiss, noting that "[t]alismanic assertions lacking factual support are insufficient to satisfy the pleading standard set by *Twombly* and *Iqbal*").

Here Morton includes very few specific, alleged acts or omissions for which Morton may be liable under 42 U.S.C. § 1983.  Dudley includes only that Morton was involved in Dudley's placement in the medical ward a few days after the assault when "on August 10, 2023, [she allegedly] approved the plan to keep [Dudley] in the infirmary."  Compl. at p. 7, ¶ 35.  Dudley

then simply states in a conclusory fashion that Morton possessed "the supervisory authority over the administration and operation of the facility," and that she could have remedied Dudley's circumstances, without providing more. Compl. at p. 7, ¶ 37. Further, he provides only a formulaic statement that she "was aware of the serious risk of harm to Plaintiff from holding him in the infirmary for an extended period of time but responded to that knowledge with deliberate indifference." Compl. at p. 11, ¶ 61. Thus, Morton not been placed on notice as to why, precisely, she is allegedly liable to the Plaintiff. That is, the Complaint raises no more than a "sheer possibility" that Morton "acted unlawfully," and, therefore, fails to state a plausible claim for relief against her. *Iqbal*, 556 U.S. at 678. The Complaint utterly fails to provide Morton "fair notice" of both the claims against him "*and the grounds upon which [they] rest[].*" *Twombly*, 550 U.S. at 555 (emphasis added) (omission in original) (internal quotations omitted). As the United States Supreme Court has explained, "while a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . . ." *Id.*; *see also Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 192 (4th Cir. 1998) ("[N]otice pleading requires generosity in interpreting a plaintiff's complaint. But generosity is not fantasy.").

###### a. *Dudley fails to establish liability under respondeat superior or due to her supervisory position.*

Without personal involvement alleged by Plaintiff, the only basis for suit against Morton would be under *respondeat superior*. However, *respondeat superior* is not available in actions brought under 42 U.S.C. §1983. *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926 (4ᵗʰ Cir. 1977). Accordingly, Morton requests that the claims against her be dismissed for failure to state a claim upon which relief can be granted. *Iqbal*, 556 U.S. at 678

("[B]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see Lewis-Bey v. Wilson*, No. 3:17CV763, 2019 WL 4889261, at *3 (E.D. Va. Oct. 3, 2019) (quoting *Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974)) ("[w]here a complaint alleges no specific act or conduct on the part of the defendant and the complaint is silent as to the defendant except for his name appearing in the caption, the complaint is properly dismissed, even under the liberal construction to be given *pro se* complaints."); *see also Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992) ("Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss."); *Calvary Christian Ctr. v. City of Fredericksburg*, 832 F. Supp. 2d 635, 642 (E.D. Va. 2011).

To the extent that the Plaintiff might be claiming Morton is liable in her supervisory capacity for the acts or omissions of her subordinates, Morton agrees that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates." *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (citation omitted). "Liability in this context is not premised on *respondeat superior*, but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Id.*

As the Fourth Circuit has explained, "[i]n order to succeed on a § 1983 claim for supervisory liability, a plaintiff must show: (1) that the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal

link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (second alteration in original)).

"As to the first element, '[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury.'" *Id.* (quoting *Shaw*, 13 F.3d at 799) (alteration in original). "As to the second element, a plaintiff 'may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses.'" *Id.* (quoting *Shaw*, 13 F.3d at 799). "Finally, as to the third element, 'proof of causation may be direct . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'" *Id.* at 226-27 (quoting *Shaw*, 13 F.3d at 799).

Overall, "[t]he plaintiff . . . assumes a heavy burden of proof in supervisory liability cases," for "[h]e must not only demonstrate that the prisoners face a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices]." *Slakan*, 737 F.3d at 372 (quoting *Orpiano*, 632 F.2d at 1101) (alteration in original). "[H]e cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, . . . [n]or can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.*

Plaintiff fails to allege facts that would plausibly support a claim of supervisory liability against Morton. Dudley does not allege the existence of "documented widespread abuses," followed by continuing supervisory "inaction." And, Dudley does not allege facts from which it

could be determined that his constitutional injury – even if one existed – was caused by any of these Morton's actions or inaction(s).  As the Fourth Circuit has held, the causation requirement in a supervisory liability conduct "is a stringent one," requiring proof that the challenged action was "'the moving force' behind the ultimate violation." *Jones v. Wellham*, 104 F.3d 620, 627 (4th Cir. 1997) (quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981)).  Accordingly, "there must be an 'affirmative link' between the policy and the violation; mere but-for causation will not suffice. . . . [T]he challenged policy decision must be one that made the ultimate violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." *Id.* (citation and quotations omitted).  The conclusory allegations in this Complaint do not tie any actual injury to a specific policy that, in turn, was a "moving force" behind the alleged harm. Because the Complaint does not contain sufficient facts from which the court could "draw the reasonable inference that the defendant[s are] liable for the misconduct alleged," Plaintiff has not stated a plausible claim against Morton.  *Iqbal*, 556 U.S. at 678.  Accordingly, this action should be dismissed on those grounds as well.

Thus, for the foregoing reasons, the Court should dismiss any perceived claims of constitutional violations against Morton in the Complaint.

## VII.    CONCLUSION

For the foregoing reasons, the Defendant, Stephanie Morton, respectfully requests that the Court dismiss the entirety of Dudley's Complaint against her, thereby completely dismissing her from this action; take no action to her detriment; and to provide her any other such relief as is necessary and appropriate under the circumstances.

Respectfully submitted,

Stephanie Morton

By:    s/  Cassandra E. Sheehan
    Cassandra E. Sheehan, VSB No. 87990
    Assistant Attorney General
    Office of the Attorney General
    Criminal Justice & Public Safety Division
    202 North Ninth Street
    Richmond, Virginia 23219
    Phone: (703) 359-1117
    Fax: (804) 786-4239
    Email: csheehan@oag.state.va.us
    *Counsel for Defendant Morton*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of March 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing ("NEF") to the following:

Danny Zemel
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA 23219
Email: dzemel@krudys.com

    s/ Cassandra E. Sheehan
    Cassandra E. Sheehan, AAG, VSB No. 87990
    Assistant Attorney General
    Office of the Attorney General