## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
#### Richmond Division

CALEB MICHAEL DUDLEY,

        Plaintiff,

                                  Civil Action No. 3:25-cv-13

v.

STEPHANIE MORTON, *et al*.

        Defendants.


## PLAINTIFF'S MEMORANDUM IN OPPOSITION
### TO DEFENDANT MORTON'S MOTION TO DISMISS

In August 2023, Caleb Dudley was assaulted by residents at the Bon Air Juvenile Correctional Center ("Bon Air") while Defendant Sherrie Joynes looked on. After being the victim of this brutal assault and requiring surgery, Caleb recuperated in the infirmary. However, once healthy, Caleb continued to languish alone in his infirmary cell. Defendant Morton ordered him held there and did not move him for half a year. During that time, Caleb was denied interaction with his peers, normal recreation hours, and visitation. Due to the actions and inactions of Defendant Stephanie Morton, the Superintendent at Bon Air, Caleb spent half a year in quasi-solitary confinement. The damage done by that stay cannot be overstated.

In this present motion to dismiss, Defendant Morton seeks to both downplay what happened to Caleb and apply the standard used for convicted adult criminals to Caleb, an adjudicated-delinquent juvenile. In the words of the Fourth Circuit, Defendant Morton has failed to "grapple with the fact that this case is about [a child]." *Doe v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 339 (4th Cir. 2020). Her memorandum in support repeatedly refers to Caleb as an adult in prison. But this case is about a child, and our history is "'replete with laws

and judicial recognition' that children cannot be viewed simply as miniature adults." *J.D.B. v. North Carolina*, 564 U.S. 261, 262 (2011) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 115-16 (1982)). The Eighth Amendment standard applicable to convicted adult criminals is not appropriate for claims brought by a juvenile detainee.

As someone being held for rehabilitative purposes, Caleb's claims should be analyzed under the professional judgment standard set out by the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307 (1982). The Eighth Amendment standard applies only to individuals who have been criminally convicted by a governmental entity and were, during that process, entitled to the full panoply of constitutional protections. As a juvenile, Caleb was not entitled to the full panoply of constitutional rights. Most notably, he was not entitled to have his case heard by a jury of his peers. *See McKeiver v. United States*, 403 U.S. 528 (1971). Accordingly, the Eighth Amendment standard cannot be appropriate for reviewing his claims. Rather, because juvenile detention in Virginia is rehabilitative, the *Youngberg* standard should apply. The Complaint alleges sufficient facts to draw the reasonable conclusion that Defendant Morton violated the *Youngberg* standard by substantially departing from the applicable professional standard when she left Caleb in the infirmary in solitary confinement for half a year.

### Relevant Facts from the Complaint

In August of 2023, Caleb Dudley was a resident at the Bon Air Juvenile Correctional Center ("Bon Air"). ¶ 7.[1] Bon Air is a juvenile rehabilitative institution committed to providing residents with "quality education, treatment, and rehabilitation and re-entry supports" that is operated by the Virginia Department of Juvenile Justice ("DJJ"). ¶ 8.

---

[1] All paragraph citations are to the Complaint, ECF 1.

On August 1, 2023, Caleb was called to the office of Defendant Sherrie Joynes. ¶ 10. Once in the office, Caleb was brutally assaulted by fellow residents while Defendant Joynes looked on. ¶¶ 11-17. Caleb needed surgery to fix the fracture in his nose and had painful bruising around his eye for weeks. ¶ 22. He accordingly was placed in the infirmary at Bon Air.

However, despite being medically cleared soon thereafter, Caleb stayed in the infirmary through February 2024, a total of six months. ¶ 24. Defendant Morton placed him in the infirmary and then kept him there for half a year. ¶¶ 35, 37. While in the infirmary, Caleb had no interaction with the other residents or any other kids his age. ¶ 29. He only left the infirmary three times in those six months. ¶ 29. His interactions were limited to Bon Air staff and once his attorney. ¶¶ 28-29. He spent 23 hours a day alone in his cell. ¶¶ 28-29. On Sundays, he could not leave his room at all. ¶ 29. He could not attend school and even had his number of phone calls severely limited. ¶¶ 27-28. Caleb was held in solitary confinement for half a year. The damage that type of isolation inflicts on a developing mind is extreme, and Caleb continues to suffer from his time in isolation. ¶ 38.

### Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. And "on a Rule 12(b)(6) motion, the burden lies with the movant to show entitlement to dismissal." *Ziegler*

*v. Dunn*, No. 3:23-cv-480, 2024 U.S. Dist. LEXIS 31659, *6 (E.D. Va. Feb. 23, 2024) (citing 5B

Charles A. Wright, Arthur R. Miller & A. Benjamin Spencer, Federal Practice & Procedure § 1357

(3d ed. 2023 update)).

<h2 style="text-align:center">Argument[2]</h2>

**I.    The Supreme Court's decision in *Youngberg v. Romeo* provides the proper standard
for this case.**

There are three standards federal courts use when evaluating claims brought by people

confined behind bars challenging the conditions of their confinement. Which standard applies

depends on the purpose for which that person is being held. Claims brought by criminally

convicted adults are evaluated under the Eighth Amendment's cruel and unusual punishments

clause. *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). Those claims are evaluated using the

deliberate indifference standard from *Farmer v. Brennan*, 511 U.S. 825 (1994). Claims brought by

those being detained for administrative purposes, such as pretrial detention, are evaluated under

the Fourteenth Amendment's due process clause. *Id*. Such claims, in the Fourth Circuit at least,

utilize the standard set out in *Short v. Hartman*, 87 F.4th 593 (4th Cir. 2023). Lastly, claims brought

by those being held for caretaking or rehabilitative purposes are evaluated under the Fourteenth

Amendment's due process clause as well, but using the professional judgment standard set out in

*Youngberg v. Romeo*, 457 U.S. 307 (1982). Here, because Caleb has not been convicted of a crime

and is being held for rehabilitative and caretaking purposes, the *Youngberg* professional judgment

standard should apply.

---

[2] Plaintiff brings his claim against Defendant Morton for her direct action and inactions,
not under *respondeat superior* or standard for supervisory liability from *Shaw v. Stroud*, 13 F.3d
791 (4th Cir. 1994). Accordingly, the arguments made by Defendant Morton on those standards,
ECF 13, at 20-24, are irrelevant.

### A.    Why the *Youngberg* standard is appropriate.

In *Youngberg*, the Supreme Court addressed the appropriate standard to apply to claims brought by an involuntarily committed mentally disabled person who alleged that the institution he was committed to "failed to provide safe conditions of confinement, unduly restricted his physical freedom, and failed to adequately train him in necessary skills." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). The Supreme Court concluded that persons in government custody for caretaking purposes "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Id*. Accordingly, liability for the person in custody's improper conditions of confinement may be imposed "'when the decision by the professional' represents a 'substantial departure from accepted professional judgment.'" *Doe v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 339 (4th Cir. 2020) (quoting *Youngberg*, 457 U.S. at 320-23)).

In reaching this conclusion, the Supreme Court focused on fashioning a test that would allow for "conditions of confinement" that "comport fully with the *purpose* of [Youngberg's] commitment." *Youngberg*, 457 U.S. at 324 (emphasis added). Mr. Youngberg had been committed involuntarily due to his inability to care for himself and his mother's inability to control his violence or to care for him any longer. *Id*. at 309-310. As Fourth Circuit caselaw confirms, the purpose of the confinement controls the applicable test, not the nature of the facility responsible for the confinement. *See Doe*, 985 F.3d at 341 ("The nature of the facility is secondary to the *reason* a person is confined in it.") (emphasis added); *see also Id.* at 339 ("The statutory and regulatory scheme governing unaccompanied children expressly states that these children are held *to give them care*.") (emphasis added).

Juvenile detention in Virginia is rehabilitative, not punitive, and therefore the *Youngberg* standard applies here. In Virginia, "'juvenile proceedings are corrective in nature rather than penal.'" *Jennings v. Commonwealth*, 82 Va. App. 692, 700 (Va. Ct. App. 2024) (quoting *Kiracofe v. Commonwealth*, 198 Va. 833, 844 (1957)). This is because, as the Virginia Supreme Court determined half a century ago, "'the primary function of juvenile courts properly considered is not conviction or punishment for crime; but crime prevention[3] and juvenile rehabilitation.'" *Id*. (quoting *Kiracofe*, 198 Va. at 844). The legislature agreed; this fact is codified in the Virginia code, which provides that, with one exception,[4] "a finding of guilty on a petition charging delinquency under the provisions of this law shall not operate to impose any of the civil disabilities ordinarily imposed by conviction for a crime." Va. Code. Ann. § 16.1-308. And the Virginia Code includes a note on "the primary function of juvenile courts" that cites to *Kiracofe*. *See* Va. Code Ann. § 16.1-227.

The assertion that juvenile delinquency proceedings and detention are rehabilitative in Virginia is not controversial. In 2005, the Court of Appeals of Virginia noted "that the primary purpose of the juvenile justice system in Virginia remains unchanged" and that purpose is "'crime prevention and juvenile rehabilitation.'" *Conkling v. Commonwealth*, 45 Va. App. 518, 522 (Va.

---

[3] As the Fourth Circuit noted in *Doe*, someone can be held for both security and treatment purposes. *See Doe*, 985 F.3d at 340 ("The Supreme Court explained [in *Youngberg*] that 'the purpose of respondent's commitment was to provide reasonable care *and* safety'—making plain that the two purposes are not mutually exclusive.") (quoting *Youngberg*, 457 U.S. at 320 n.27) (emphasis in original).

[4] The only exception is for juveniles "found guilty of a felony in circuit court whose case is disposed of in the same manner as an adult criminal case." Va. Code Ann. § 16.1-308. A juvenile who is tried as an adult will suffer the same consequences as an adult who committed the same act. That exception does not apply to Caleb, who was not tried as an adult and has not suffered the same collateral consequences that come with conviction of a crime.

Ct. App. 2005) (quoting *Kiracofe*, 198 Va. at 844).[5] The Court of Appeals of Virginia reaffirmed this in 2022, *see Ritchie v. Commonwealth*, 74 Va. App. 328, 335 (Va. Ct. App. 2022), and again in 2024, *see Jennings*, 82 Va. App. at 700. *Kiracofe* accurately describes the current nature of juvenile detention in Virginia—it is for rehabilitation, not punishment.

Federal courts applying Virginia law have reached the same conclusion. In *Reaves by Reaves v. Peace,* the district court analyzed the Virginia code and concluded that the juvenile detention system "is intended not to punish juveniles, but to rehabilitate them and to protect the Community." No. 3:95cv640, 1996 U.S. Dist. LEXIS 7482, *22 (E.D. Va. Mar. 22, 1996). And therefore, "the Eighth Amendment is not the yardstick against which to measure the constitutional acceptability of the conditions of that detention." *Id*. at *23. Similarly, in *United States v. Davis*, the district court looked at the statutory scheme in Virginia, as well as the decision in *Kiracofe,* and concluded that "adjudications of delinquency do not constitute convictions of crime under Virginia law." 234 F. Supp. 2d 601, 605-06 (E.D. Va. 2002) *aff'd United States v. Walters*, 359 F.3d 340 (4th Cir. 2004).

While rehabilitation has been codified and recognized by the courts as the primary purpose of juvenile detention for the past half-century, this purpose was also reinforced by DJJ's own actions within the past decade. In 2021, the Joint Legislative Audit and Review Commission, which is tasked in part with making "special studies and reports of the operations and functions of state agencies as it deems appropriate and as may be requested by the General Assembly," Va. Code. Ann. § 30-58.1, completed a report on Virginia's Juvenile Justice System. JLARC Report

---

[5] In *Conkling*, the court also noted that the Office of the Attorney General ("OAG") had issued an opinion stating that "proceedings in juvenile court are civil, and not criminal, in nature." 45 Va. App. 518, at 524. That opinion from the OAG relied on *Lewis v. Commonwealth*, 214 Va. 150 (1973).

558, *available at* https://jlarc.virginia.gov/pdfs/reports/Rpt558-1.pdf; *see* Fed. R. Evid. 201 (allowing for judicial notice of adjudicative facts). As that Report details, in 2016, the General Assembly directed DJJ to, among other things, "ensure youth receive rehabilitative services that meet their needs and reduce the risk they reoffend." *Id*. at 6. Accordingly, DJJ closed one correctional center and "implement[ed] a new rehabilitative model for working with youth in juvenile correctional centers and shift[ed] away from the correctional model used for adults." *Id*. DJJ's own website states that they "will balance the safety of the community with the rehabilitative needs of our youth." https://www.djj.virginia.gov/pages/about-djj/djj-transformation.htm. The agency says it "must hold youth accountable for their actions by *ensuring they receive the services they need*, at the dosage they need it for, in order to create the greatest likelihood of success when they are no longer in our care." *Id*. (emphasis added).

More broadly, the full swath of constitutional requirements attendant to a criminal trial are not entirely present in a juvenile delinquency proceeding. This absence is in part because federal law sees juvenile proceedings as rehabilitative in nature. In *McKeiver v. Pennsylvania*, the Supreme Court addressed whether the Constitution guaranteed "the right to trial by jury in the adjudicative phase of a state juvenile court delinquency proceeding." 403 U.S. 528 (1971). The Court answered no, because doing so would "remake the juvenile proceeding into a fully adversary process and [] put an effective end to what has been the idealistic prospect of an intimate, informal protective proceeding." *Id*. at 545 (plurality opinion); *see also id.* at 557 (Harlan, J., concurring in the judgment). The Court refused to say that "the system cannot accomplish its *rehabilitative goals*." *Id*. at 547 (emphasis added). *See also id.* at 552 (White, J., concurring) ("Supervision or confinement [of a juvenile] is aimed at rehabilitation, not at convincing the juvenile of his error simply by imposing pains and penalties."). As the Fourth Circuit summarized, the Supreme Court

was concerned "that a jury requirement would undermine the unique rehabilitative, if imperfectly realized, goals of the juvenile justice system." *United States v. Wright*, 594 F.3d 259, 263 (4th Cir. 2010).

The application of the Eighth Amendment standards to a juvenile detainee's conditions of confinement claim would constitute a miscarriage of justice. The Supreme Court has held the Eighth Amendment standard is "appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions," *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). Virginia did not comply with Constitutional guarantees when adjudicating Caleb's case. Notably, like all juveniles, Caleb did not receive a jury trial. He therefore cannot be legally considered a convicted criminal. *See* Va. Code. Ann § 16.1-308 ("a finding of guilty on a petition charging delinquency under the provisions of this law shall not operate to impose any of the civil disabilities ordinarily imposed by conviction for a crime"). Caleb is a kid who was adjudicated delinquent and accordingly held by the Commonwealth for the purposes of keeping the community safe and rehabilitating him. The proper standard for a claim brought someone in Caleb's position is the *Youngberg* standard of professional judgment.

## B.    Defendant Morton's arguments to the contrary are not compelling.

Defendant Morton argues that only the Eighth Amendment can apply to Caleb's condition because (1) *Youngberg* applies only to "the civil commitment of an involuntarily committed intellectually disabled person," and (2) delinquent juvenile acts are criminal acts. ECF 13, at 6. As to the first contention, the Defendant misconstrues *Youngberg* and the nature of Supreme Court holdings. The Fourth Circuit has explained that the *Youngberg* standard was created for any situation where a person's commitment is for rehabilitative, and not administrative or punitive, reasons. *Youngberg* provides a separate standard to use where "[o]ne of the main purposes," of the

commitment is "to provide treatment." *Doe v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 339 (4th Cir. 2020) (quoting *Patten v. Nichols*, 274 F.3d 829, 840-41 (4th Cir. 2001)). It is not that civilly committed disabled individuals have their own standard applicable only to them; rather, *Youngberg* applies where the commitment is neither administrative nor punitive. Moreover, Defendant Morton's attempt to narrow *Youngberg* to justify its facts runs contrary to Fourth Circuit precedent. *See Matherly v. Andrews*, 859 F.3d 264, 274-75 (4th Cir. 2017) (applying the *Youngberg* standard to a person involuntarily committed to a prison for purposes of treating his dangerousness as a sexual offender); *Doe*, 985 F.3d at 342 (applying the *Youngberg* standard to a facility caring for unaccompanied migrant children).

As to the second contention, Defendant Morton gestures to state law, Va. Code § 16.1-278.7 and § 16.1-228, to support her assertion that Caleb can be labeled a criminal. But § 16.1-278.7 does not use "criminal" anywhere. On the contrary, it expressly uses the term "adjudicated delinquent." This non-colloquial term seems likely selected precisely to denote a status other than "criminal." For similar reasons, Morton's invocation of the definition of "delinquent act" in Va. Code. § 16.1-228 as a "crime" should not avail. ECF 16, at 6. First off, the very next definition, "delinquent child," uses the phrase "child who has committed a delinquent act." Va. Code. § 16.1-228. It does not refer to the child as having committed a crime or being convicted of anything. Further, elsewhere in the Code, the legislature has clarified that "crime" in the juvenile context does not carry the same punitive implication as it does in the adult context. *See* Va. Code. § 16.1-308. Further, Virginia courts have endorsed such interpretation. *Kiracofe v. Commonwealth*, 198 Va. 833, 844 (1957); *see infra* part 1(A). To give "delinquent" the same meaning as "criminal"

here would overturn decades of precedent relying on *Kiracofe* and undermine the statutory scheme as designed by the legislature.[6]

Defendant Morton also points to two non-binding district court opinions applying the Eighth Amendment in the juvenile detention context in Virginia. ECF 13, at 6 (citing *Coleman v. Va. Dep't of Corr.*, 2023 U.S. Dist. LEXIS 240739, *8 (E.D. Va. 2023); *Blankenship v. Virginia*, 432 F. Supp. 2d 607 (E.D. Va. 2006)). However, the plaintiffs in both *Coleman* and *Blankenship* brought their claims under the Eighth Amendment. *Coleman*, Case No. 1:18-cv-781, ECF 1, at 5-6; *Blankenship*, 432 F. Supp. 2d at 610. There was no discussion of the applicable standard. Other plaintiffs' decisions to plead under more stringent standards than needed should not constrain Caleb here. *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (our adversarial system "rel[ies] on the parties to frame the issues for decision and assign[s] to courts the role of neutral arbiter of matters the parties present") (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2009)). Thus, we would not expect the trial courts in these cases to have *sua sponte* applied *Youngberg* as it was not plead or raised at any point. More importantly though, these cases are not binding on this Court, and binding precedent from the Supreme Court and the Fourth Circuit require that *Youngberg* be applied in this matter.

## II.    Even if this Court applies the Eighth Amendment standard, Plaintiff has still alleged sufficient facts to proceed to discovery.

Like all Eighth Amendment claims, a conditions of confinement claim requires proof of both an objective and a subjective prong. First, the plaintiff must demonstrate that they suffered "a 'serious deprivation of a basic human need.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Where a prisoner alleges several different

---

[6] Labeling Caleb a criminal when he was not entitled to a trial by a jury of his peers would also raise Constitutional issues.

deprivations, each of which may not rise to a sufficiently serious level to establish a constitutional deprivation independently, courts may consider the degree to which the separate conditions "interact" with each other to create a "deprivation of a single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991). Second, the plaintiff must demonstrate that the defendant acted with "deliberate indifference" towards the prisoner's exposure to inhumane conditions. *Wilson*, 501 U.S. at 303. Again, Plaintiff does not agree that this standard should apply. However, if it is applied, Plaintiff's complaint satisfies both prongs.

### A.    The objective harm standard is necessarily lower for children.

As the Fourth Circuit has explained, whether a deprivation is "sufficiently serious" depends on whether it "violated contemporary notions of decency" and "resulted in serious or significant physical or emotional injury." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th Cir. 1993). As the Supreme Court has made clear in the Eighth Amendment context recently, contemporary notions of decency require treating children different from adults. *See Roper v. Simmons*, 543 U.S. 551 (2005) (outlawing the death penalty for crimes committed when the person was juvenile); *Graham v. Florida*, 560 U.S. 48 (2010) (sentencing a juvenile offender to life in prison without the possibility of parole for a nonhomicide crime constitutes cruel and unusual punishment); *Miller v. Alabama*, 567 U.S. 460 (2012) (mandatory life in prison for juvenile homicide offenders violates the Eighth Amendment); and *Montgomery v. Louisiana*, 577 U.S. 190 (2016) (*Miller* applies retroactively). The same should apply here. If the Eighth Amendment is applied in this case, contemporary notions of decency require that the bar for what constitutes a sufficiently serious deprivation is lower for juveniles than for adults.

The Fourth Circuit endorsed the view that the particular characteristics of a plaintiff can inform whether a deprivation is sufficiently serious in *Thomas v. Younce*, 604 F. Appx. 325 (4th

Cir. 2015). In that case, a prisoner brought a condition of confinement claim based on having to sleep in the top bunk in a cell that was not on the ground floor. On their own, such conditions do not appear to be unconstitutional. Yet the prisoner in *Thomas* had a medical condition that a doctor determined required him to be housed on the ground floor and in the bottom bunk. *Id*. at 325. Given the prisoner's medical condition, the Fourth Circuit held that he stated a valid condition of confinement claim. *Id*. at 326. In other words, while being celled above the ground floor and assigned a top bunk would not normally be "sufficiently serious" deprivations to satisfy the objective prong of the deliberate indifference test, they were when applied to a prisoner with a medical vulnerability to those exact conditions. The individual characteristics of the plaintiff impact the determination of whether a set of conditions are sufficiently serious. The conditions Caleb endured were sufficiently serious to trigger Eighth Amendment protections on their own. But, were there any doubt, the conditions were certainly sufficiently serious as applied to Caleb, a juvenile detainee.

### B.    Plaintiff has alleged sufficiently harmful conditions of confinement.

Caleb's quasi-solitary conditions were sufficiently harmful. While in the infirmary, Caleb was held for six months without exercise, education, or socialization. ¶¶ 24-27. He spent 23 or more hours a day in his cell. ¶¶ 28-29. In his first four months in the infirmary, Caleb made only twelve phone calls. ¶ 28. He was released from the infirmary on only three occasions for twenty minutes each time. ¶ 29. He had no interaction with other residents of the facility or any other kids his own age. ¶ 32 (describing the extent of Caleb's interaction with other people to be with his doctor during this time). While each of these restrictions are sufficiently serious on their own, they certainly combined to deprive Caleb of the basic human need of social interaction.

Contrary to Defendant Morton's assertion, Caleb did experience "prolonged periods of isolation." ECF 13, at 11. If spending 23 hours or more alone in a cell does not count as prolonged periods of isolation, what does? Defendant Morton's drawing of inferences in her favor (suggesting that other residents were also in the infirmary and thus could interact with Caleb, ECF 13, at 12) is not allowed at the motion to dismiss stage. Moreover, again, Caleb was in his cell close to 24/7. His interaction with other humans, let alone kids his age, was limited only to his doctor and one visit from his attorney. ¶ 32. It is worth repeating that Caleb left his cell for recreation only *twice* in the *six* months he spent in the infirmary. ¶ 29. The rest of Defendant Morton's arguments are merely attempts at separating each aspect of Caleb's confinement and saying that specific restriction was okay. While she is correct that a lack of educational opportunities alone, or a lack of visitors alone, may not violate the Eighth Amendment, the combination of all that Caleb was subjected to certainly does.

Defendant Morton's contention that Caleb's conditions were not that serious is especially surprising given the Fourth Circuit's holding in *Porter*, which the OAG, the same office representing Defendant Morton, litigated. *Porter* involved a challenge to solitary confinement for death row prisoners in Virginia. In *Porter*, the plaintiffs were allowed "one hour of outdoor recreation five days a week, and a ten-minute shower three days a week." *Porter*, 923 F.3d at 353. They were allowed to "keep a television and compact disc player in their cell and borrow approved publications and library materials to read." *Id*. at 354. They could also "request and use wireless telephones any day of the week between 8:00 a.m. and 9:30 p.m." *Id*. Visitation was extremely limited and those on death row were kept from congregating with the rest of the prison population. *Id*. The Fourth Circuit found that prolonged time in those conditions violated the Eighth Amendment. Specifically, the court held that confinement "between 23 and 24 hours a day 'alone,

in a small . . . cell' with 'no access to congregate religious, educational, or social programming'—pose[s] a 'substantial risk' of serious psychological and emotional harm." *Id*. at 357 (quoting *Porter v. Clarke*, 290 F. Supp. 3d 518, 527-28 (E.D. Va. 2018)). Caleb was subjected to similar conditions and similarly can state a claim under the Eighth Amendment.

It should not be controversial to state that an extended stay in solitary confinement is harmful to a juvenile. The potential harms of extended solitary confinement have been extensively researched and are well known to the federal courts. The Fourth Circuit in *Porter* noted "there is *not a single published study* of solitary . . . confinement in which nonvoluntary confinement lasted for longer than 10 days . . . *that failed to result in negative psychological effects." Porter*, 923 F.3d at 356 (quotation omitted) (emphasis preserved); *see also Grissom v. Roberts*, 902 F.3d 1162, 1176 (10th Cir. 2018) (Lucero, J., concurring) ("Our society has long understood that extended periods of isolation take a significant toll on the human psyche."). Numerous Supreme Court justices have also recognized the harms of solitary confinement. *See Apodaca v. Raemisch,* 586 U.S. 931, 937 (2018) (Sotomayor, J., concurring in denial of certiorari) (solitary confinement "comes perilously close to a penal tomb") (citation omitted); *Ruiz v. Texa*s, 580 U.S. 1191, 1192 (2017) (Breyer, J., dissenting from denial of stay of execution) (stating that evidence demonstrated that the petitioner, "ha[d] developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty"); *Davis v. Ayala*, 576 U.S. 27, 289 (2015) (Kennedy, J., concurring) ("research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exactly a terrible price"). As to the impact of these conditions on children, still developing, one can infer that the harms are even more readily apparent. *See J.H. v. Williamson Cty.*, 951 F.3d 709, 718 (6th Cir.

2020) (noting that a "growing chorus of courts have recognized the unique harms that are inflicted on juveniles when they are placed in solitary confinement") (collecting cases).

Isolating conditions of any kind are known to be harmful in the extreme—mentally, emotionally, and physically. One can infer that that is part of why Bon Air's own policies ensure kids receive activities throughout the day, including "school, healthy recreation" and "many different meetings and groups." ¶ 26. These polices are not just about keeping kids busy—they are about preventing harms that are crippling to a developing brain. The science on this has long been clear: solitary confinement, defined as being "alone in a cell for all, or nearly all, of the day with minimal environmental stimulation and minimal opportunity for social interaction – can cause severe psychiatric harm." Stuart Grassian, *Prison Reform: Commission on Safety and Abuse in America's Prisons: Psychiatric Effects of Solitary Confinement*, 22 WASH U. J. L. & POL'Y 325, 327 (2006). Almost two decades ago, there was already "a major body of medical and scientific literature concerning the effects of sensory deprivation and social isolation." *Id*. at 330. That research showed that "even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium." *Id*. at 331. Even people "who are more psychologically resilient inevitably suffer severe psychological pain as a result of such confinement." *Id*. at 354.

Thus, Caleb's condition in the infirmary did pose a substantial risk of harm. *See* Elizabeth Bennion, *Banning the Bing: Why Extreme Solitary Confinement is Cruel and Far Too Usual Punishment*, 90 IND. L. J. 741, 756 (2015) ("Social isolation is as strong a risk factor for morbidity and mortality as are smoking, obesity, a sedentary lifestyle, and high blood pressure."). And again, although these deprivations are sufficient on their own to state a claim for relief, Caleb's vulnerable

status as a juvenile puts his claim beyond doubt.[7] Contemporary notions of decency mandate that children are not left alone in a cell for 23 hours (or more) per day for half a year.

### C.    Plaintiff has alleged sufficient facts to infer, at this stage, that Defendant Morton was aware of those harmful conditions, and responded with deliberate indifference.

Because a defendant's knowledge that her actions or inactions "might cause harm" "is a question of fact," it can be proven in the "usual ways" that mental states are proven, "including inference from circumstantial evidence." *Farmer* 511 U.S. at 842.[8] In addition, the "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. (internal citations omitted). Here, there is sufficient circumstantial evidence in the Complaint to draw the inference that Defendant Morton was aware of Caleb's condition and aware that her inaction might put him at a substantial risk of harm.

Defendant Morton is the one who approved the order keeping Caleb in the infirmary past it being medically necessary. ¶ 35. The administrative body responsible for managing Caleb's housing, the Institutional Classification and Review Committee ("ICRC") met at least five times about Caleb's situation and designed a plan suggesting Caleb should be transferred. ¶ 31, 33. The number and ongoing nature of meetings by the ICRC about Caleb's housing indicates that Defendant Morton and her colleagues understood the harm they were perpetuating. And Defendant

---

[7] Defendant Morton's citations to *Sweet v. South Carolina Department of Correction* to support her assertion that Caleb did not suffer a serious deprivation can be quickly dismissed. ECF 13, at 13-14 (citing *Sweet v. South Carolina Department of Correction*, 529 F.2d 854 (4th Cir. 1975)). As Fourth Circuit has noted, *Sweet* predated "*all* of the Supreme Court's conditions of confinement decisions" and "lacked the benefit of the recent academic literature . . . concerning the harmful psychological and emotional effects of prolonged solitary confinement." *Porter,* 923 F.3d at 358. And further, *Sweet* was "decided under a *different legal standard*." *Id* (emphasis added).

[8] The "might" in that statement is key. The law does not require that the defendant was *certain* that their behavior would cause harm.

Morton would have been aware that DJJ's own policies and strategies ensure residents have "highly structured" schedules with "planned interactive activities that teach life skills . . . [including] school, healthy recreation . . . and many different meetings and groups." *Id.* at 5. Again, presumably, DJJ has designed these activities and schedules with the knowledge that young people, children, need stimulation and interaction with the world in part for their health. Thus, it should have been obvious to Morton that the plan she personally approved was depriving Caleb of the stimulation DJJ's policies provide for.

Perhaps most damning is the fact that an outside report about Bon Air done during the time Caleb was in the infirmary states that one resident "was housed in the infirmary for non-medical reasons" and had been there for a while. ¶ 36. It is a reasonable inference at this stage that Defendant Morton read that report.[9] And even if she did not, Caleb's condition was well known enough within Bon Air that the outside consultants made a note of it. It is eminently reasonable to infer that the Superintendent of the facility also knew.

Lastly, as discussed above, the harms of solitary confinement are well known, especially when it comes to children. The risk to Caleb that came from ignoring Bon Air's policies and subjecting him to solitary confinement was obvious. At this stage, it is fair to infer that Defendant Morton knew that keeping a kid in solitary confinement might (and did) subject that child to a serious risk of harm.

---

[9] The Court may also take judicial notice of the fact that during this "onsite visit," the consulting group interviewed "agency and facility leadership." The Moss Group, *Virginia Department of Juvenile Justice Bon Air Juvenile Correctional Center Culture and Safety Assessment*, Spring 2024, Page 6, available at https://ewscripps.brightspotcdn.com/14/dc/3e78afd5422dbafb3e9237495fab/cultural-assessment-vadjj-redacted.pdf; *see also Phillips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record."). As a report commissioned by a state agency and done in coordination with the agency, this qualifies as a public record.

It is therefore reasonable to infer that Defendant Morton would know that absent further action by her, Caleb would stay in isolation and continue to suffer the deprivations attendant thereto. Defendant Morton can argue and introduce evidence later that she was detached from the daily operations at Bon Air and thus unaware of what was happening to Caleb. She may argue she was not aware of the meetings being held about Caleb and never spoke to any staff about him. But at this stage, inferring that she was unaware of the meetings and DJJ's own policies about stimulation would be to draw inferences against the plaintiff, which is not permitted.

### D.    Defendant Morton is not entitled to qualified immunity.

Defendant Morton argues that she is entitled to qualified immunity because "in August 2023 through February 2024, case law did not clearly establish that placing an adult in the infirmary under the conditions Dudley complains of would cause severe enough harm to implicate the Eighth Amendment." ECF 13, at 19. Putting aside the conspicuous use of "adult," that is not the proper test. As the Fourth Circuit made clear in *Thorpe v. Clark*, if a plaintiff has alleged sufficient facts to demonstrate deliberate indifference, the defendant cannot be awarded qualified immunity. 37 F.4th 926, 934 (4th Cir. 2022). This is because a reasonable official who acts with deliberate indifference cannot simultaneously think their actions are lawful.

The affirmative defense of qualified immunity ensures that before officers are held liable, they have "notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Whether an officer has notice is a question of "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Government officials are presumed to be aware of clearly established rights.

A right can be "clearly established" in two different ways. First, a right is clearly established if it has been explicated in the caselaw, either in a case of controlling authority in the relevant jurisdiction, or by "a consensus of cases of persuasive authority." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). Second, a right can also be clearly established by "a general constitutional rule already identified in the decisional law." *Hope v*. Pelzer, 536 U.S. 730, 741 (2002). In this regard, rights can be clearly established even if a court has never specifically declared the right to exist. *Id*. This stems from the fact that some rights are obvious. *Id*.

In *Thorpe v. Clarke*, the Fourth Circuit addressed how qualified immunity works in the context of the Eighth Amendment, which, unlike the Fourth Amendment, "prohibits only intentional conduct." 37 F.4th 926, 934 (4th Cir. 2022). Because qualified immunity "fundamentally concerns itself with 'fair notice,'" an officer who knowingly violates the law will not be granted immunity. *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Accordingly, for Eighth Amendment claims, which require a minimum mental state of deliberate indifference, "when 'plaintiffs have made a showing sufficient to' demonstrate an intentional violation of the Eighth Amendment, 'they have also made a showing sufficient to overcome any claim to qualified immunity.'" *Id*. (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001)). The merits and the qualified immunity analysis for deliberate indifference "effectively collapse into one." *Id*. (quoting *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996)).[10]

---

[10] Defendant Morton may argue that the Fourth Circuit's holding in *Pfaller v. Amonette*, 55 F.4th 436 (4th Cir. 2022) attempted to at least partially walk back the holding from *Thorpe*. In the Fourth Circuit, "one panel cannot overrule a decision issued by another panel." *McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) (en banc). Accordingly, to the extent there is a conflict between *Thorpe* and later opinions from the Fourth Circuit, the "earlier of the conflicting opinions" shall govern. *Id*. at 333.

The Supreme Court mirrored this approach in *Ortiz v. Jordan*, 562 U.S. 160 (2011). In *Ortiz*, the question was a procedural one not relevant here about the ability to appeal an order denying qualified immunity at summary judgment after a full trial on the merits. *Id*. at 183-84. However, the underlying merits of the case were about alleged deliberate indifference in the form of failure to protect. *Id*. at 183. The Supreme Court held the "pre-existing law was not in controversy" and cited to *Farmer v. Brennan*. *Id*. at 190 (citing 511 U.S. 825, 834 (1994)). The Supreme Court did not look at the specific facts of *Farmer* as compared to the plaintiff in *Ortiz*. The establishment of the appropriate mental standard was sufficient. *See Pfaller v. Amonette*, 55 F.4th 436, 448 (4th Cir. 2022) (noting that sometimes "the court need not separately determine whether the constitutional right was clearly established if there remains a genuine issue of material fact as to an official's deliberate indifference, because that potential deliberate indifference would, if established, necessarily include an awareness of the illegality of the defendant's actions."). In other words, an official cannot simultaneously act with deliberate indifference and also have no notice their conduct is unconstitutional. Thus, qualified immunity would not be applicable in such an instance.

Once the proper legal framework is in place, Defendant Morton's claim of qualified immunity falls apart. Because Plaintiff has alleged sufficient facts to demonstrate the subjective prong of Eighth Amendment deliberate indifference, Defendant Morton cannot carry her burden of demonstrating the affirmative defense of qualified immunity. *See Mays v. Sprinkle*, 992 F.3d 295, 305 (4th Cir. 2022) ("[W]e conclude that the complaint plausibly alleges that Mays had an objectively serious medical condition requiring medical attention and that the officers subjectively knew of that need and the excessive risk of their inaction. That is enough to overcome qualified immunity and survive a motion to dismiss."). The defense of "qualified immunity does 'not allow

the official who actually knows that he was violating the law to escape liability for his actions.'"

*Thorpe*, 37 F.4th at 933 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 821 (1982) (Brennan, J.,

concurring)). Defendant Morton should be denied the benefit of that defense.

Defendant Morton seems to acknowledge that sufficient allegations of deliberate

indifference in a complaint preclude a grant of qualified immunity. *See* ECF 13, at 19 (arguing that

"Dudley never suggests that Morton possessed actual knowledge"). However, her points in that

section are just arguments that Plaintiff has not sufficiently alleged deliberate indifference. As

discussed above, *supra* at Section II(C), there is sufficient circumstantial evidence to infer at this

stage that Defendant Morton was aware of Caleb's condition. In fact, it would be quite surprising

if the individuals doing the consulting report knew more than Defendant Morton. She has not

carried her burden of proving she is entitled to qualified immunity at this stage.

**III.    Defendant has waived any arguments regarding the merits if this Court determines that the Fourteenth Amendment (regardless of which Fourteenth Amendment standard) applies.**

In her memorandum supporting her motion to dismiss, Defendant Morton asks that if the

"Court believes the Fourteenth Amendment applies," she "requests leave to file a supplemental

brief on that issue." ECF 13, at 6-7. By "that issue," Plaintiff takes Defendant Morton to mean the

merits of the claim utilizing the Fourteenth Amendment standard. However, regardless of the exact

meaning of "that issue," a defendant is not allowed to offer some theories for why a case should

be dismissed and keep other arguments in their pocket in case the first ones do not work. Federal

Rule of Civil Procedure Rule 12 forbids, with a few limited exceptions not applicable here,

"mak[ing] another motion under this rule raising a defense or objection that was available to the

party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). That is exactly what Defendant

Morton seeks to do here, and the Court should not permit such a piecemeal attack.

The requirement that a party consolidate its defenses and objections in one motion "is intended 'to eliminate unnecessary delay at the pleading stage' by encouraging 'the presentation of an omnibus pre-answer motion in which the defendant advances every available Rule 12 defense' simultaneously rather than 'interposing these defenses and objections in piecemeal fashion.'" *Leyse v. Bank of America Nat. Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015) (quoting Charles Alan Wright & Arthur R. Miller, 5C Fed. Prac. & Proc. Civ. § 1384 (3d ed. 2014)). Plaintiff is allowed to plead the alternative—here that means alternative legal standards. Fed. R. Civ. P. 8(d)(2); *Hayes v. Prudential Ins. Co. of Am.*, 60 F.4th 848, 855 (4th Cir. 2023). Defendants are not allowed to respond to one allegation and reserve the right to respond to the rest if the Court disagrees on the first one. Accordingly, if this Court holds that the *Youngberg* standard, or any other Fourteenth Amendment standard applies, Defendant Morton has waived her right to allege Plaintiff has not stated a claim utilizing that standard.[11] However, out of an abundance of caution, Plaintiff will briefly address why he has met the *Youngberg* standard as well.[12]

## IV.    Plaintiff has alleged sufficient facts to draw the conclusion that Defendant Morton's actions grossly deviated from the standards of professional judgment.

To state a claim under *Youngberg*, a plaintiff must demonstrate that the defendant's conduct represents "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). Likely due to the paucity of claims brought under the *Youngberg* standard, the Fourth Circuit has not "explained the precise difference between the

---

[11] Nor can Defendant Morton remedy her waiver in her reply brief. *See Benton v. Berkshire Richmond LLC*, No. 3:23-cv-704, 2024 U.S. Dist. LEXIS 201645, *4 n.2 (E.D. Va. Nov. 5, 2024); *Morton v. DeJoy*, No. 3:23-cv-618, 2024 U.S. Dist. LEXIS 159461, *39 n.22 (E.D. Va. Sept. 4, 2024).

[12] If this Court grants Defendant Morton the right to file a second motion to dismiss, Plaintiff will of course respond to that motion as well.

standards of professional judgment and deliberate indifference." *Doe 4 by & through Lopez v. Shenandoah Valley Juv. Ctr. Comm'n*, 985 F.3d 327, 343 (4th Cir. 2021). However, a few guidelines can be extracted from the caselaw.

The main distinction between the standards is that the *Youngberg* standard is an objective analysis; the plaintiff does not need "proof of subjective intent." *Doe*, at 343. However, the plaintiff still must demonstrate "more than negligence." *Id*. at 342. And because "[w]hat constitutes the relevant professional norm can be a difficult factual question," the plaintiff is not under any requirement at the pleadings stage to "articulate a professional standard of care." *Riddick v. Barber*, 109 F.4th 639, 646 (4th Cir. 2024). To survive a motion to dismiss, the plaintiff need merely to plead "facts regarding his treatment from which it may be reasonably inferred that such treatment fell substantially outside the professional standard of care and the bounds of professional judgment." *Id*. Caleb has done so here.

As described in detail above, Caleb was held without access to his peers, normal exercise, visitors, or even regular haircuts. He spent months in a cell with only Bon Air staff to interact with. The conditions Caleb was subjected to represent a massive departure from the acceptable professional standards for treating juvenile delinquents. Caleb left his cell for six hours or less a week. That is roughly the same time that the death row prisoners in *Porter* spent outside their cell. While Plaintiff is not required to define that standard at this stage, the fact that Caleb's treatment violated the Eighth Amendment and went against even Bon Air's own policies makes it an easy conclusion that it also departed from professional standards. *See Thomas S. Flaherty*, 902 F.2d 250, 252 (4th Cir. 1990) (relying in part on a state agency's written policies to identify the accepted professional standards). Caleb went without school, adequate physical activity, social interaction, and the number of phone calls per week (his only contact with his family) Bon Air's Resident

Handbook established. ¶ 28. Defendant Morton's treatment of Caleb substantially departed from accepted professional standards befitting a Superintendent of a juvenile detention center. Caleb's claim should be allowed to proceed to discovery.

*    *    *

Caleb Dudley is a juvenile detainee at Bon Air. After being assaulted due to the unconstitutional actions of a staff member, Caleb ended up in the infirmary. He would spend half a year there, kept in a cell by himself for 23 hours a day, sometimes all day. Defendant Morton, the Superintendent at Bon Air, instructed that Caleb stay in the infirmary past it being medically necessary. She then left Caleb in solitary confinement for six months. In her defense, Defendant Morton attempts to downplay the severity of Caleb's isolation. She also seeks to treat Caleb like a criminally convicted adult being held by the Virginia Department of Corrections. This Court should quickly reject both contentions. As a juvenile committed for rehabilitation, Caleb's claims must be analyzed under the professional judgment standard explicated by the Supreme Court in *Youngberg*. Defendant Morton's actions represent a gross departure from the standard applicable to a Superintendent of a juvenile correctional facility in Virginia and her motion to dismiss the claims against her should be denied.

Respectfully submitted,

CALEB MICHAEL DUDLEY,


By: _____/s/ Danny Zemel
                Counsel

Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA 23219
Phone: (804) 774-7950

Fax:    (804) 381-4458
Email: dzemel@krudys.com
*Counsel for Plaintiff*

### Certificate of Service

I hereby certify that on this 7th day of April 2025, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing to all counsel of record.

By:    /s/ Danny Zemel__
            Counsel