**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

CALEB MICHAEL DUDLEY,
        Plaintiff,

v.                                  CIVIL ACTION NO. 3:25cv13

DANIELLE JOYNES and STEPHANIE MORTON,
        Defendant.

**REPLY BRIEF TO PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANT MORTON'S MOTION TO DISMISS (ECF NO. 17)**

    COMES NOW, Defendant, STEPHANIE MORTON, and for her Reply Brief to Plaintiff's Memorandum in Opposition to Defendant Morton's Motion to Dismiss ("ECF No. 17" or "Brief in Opp.") provides as follows:

    1.  **YOUNGBERG V. ROMEO IS NOT THE PROPER STANDARD FOR THIS MATTER.**

    The Court should evaluate this matter under the Eighth Amendment deliberate indifference standard rather than the Fourteenth Amendment analysis discussed in *Youngberg v. Romeo*, 457 U.S. 307 (1982). In *Youngberg*, the Supreme Court considered the Fourteenth Amendment protections guaranteed to a mentally disabled person involuntarily committed to a state institution and determined that the institutionalized individual possessed substantive rights under the Due Process Clause of the Fourteenth Amendment to safe conditions of confinement, freedom from bodily restraints, and, training or "habilitation." 457 U.S. at 320-23. The *Youngberg* Court noted that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 322 (citing *Estelle* v. *Gamble*, 429 U.S. 97, 104 (1976)).

    The Fourth Circuit applied the standard articulated in *Youngberg* to the plaintiff's—who was an involuntarily committed psychiatric patient—claim of inadequate medical care. *Patten v.*

*Nichols*, 274 F.3d 829, 842 (4th Cir. 2001) (noting that pre-trial detainees and involuntarily committed patients both look to the Fourteenth Amendment for protection and neither group may be punished in the Eighth Amendment sense). The *Patten* Court determined that there are "sufficient differences between 'pre-trial detainees' and 'involuntarily committed psychiatric patients' to justify the application of *Youngberg*'s "professional judgment" standard for the latter rather than a traditional Fourteenth Amendment substantive due process analysis. *See Doe v. Shenandoah Valley Juvenile Ctr. Comm'n*, 985 F.3d 327, 329, 339 (4th Cir. 2021). The *Patten* Court noted the "most obvious and most important difference" between the two *were the reason why the individual was taken into custody. Patten*, 275 F.3d at 840-41 (emphasis added); *see also Doe*, 985 F.3d at 339. The Fourth Circuit reasoned that one of the main purposes of involuntary commitment is to provide treatment, while a pre-trial detainee "is taken into custody because the state believes the detainee has committed a crime, and the detainee is kept in custody to ensure that he appears for trial and serves any sentence that might ultimately be imposed." *Doe*, 985 F.3d 339 (quoting *Patten*, 274 F.3d at 840-41) (internal citations omitted)). The *Patten* Court then provided other grounds justifying the use of the *Youngberg* standard instead of the deliberate indifference analysis—first, that "[p]re-trial detainees generally are housed in jails or prisons staffed by law enforcement officials, while involuntarily committed patients generally are housed in hospitals staffed by medical professionals," and second, that "many patients who are involuntarily committed face lengthy and even lifelong confinement," while "pre-trial detainees. . . usually retain that status for a relatively short period of time, until released on bond or until the resolution of the charges against them." *Doe*, 985 F.3d at 339 (citing *Patten*, 275 3d. at 841).

The Fourth Circuit then subsequently relied on *Youngberg* and *Patten* when deciding *Doe*, where the appellant plaintiffs were immigrant children who fled their native countries after

experiencing appalling horrors. *Doe*, 985 F.3d at 339. Under federal law, the appellants were deemed unaccompanied alien children who fell under the custody of the Department of Health and Human Service's Office of Refugee Resettlement, which coordinates the care and placement of unaccompanied children. *Id.* "Federal statute requires these children to 'be promptly placed in the least restrictive setting that is in the best interest of the child"; and "must be 'capable of providing for the child's physical and mental wellbeing.'" *Id.* (citing § 1232(c)(3)(A)). The juvenile appellants in *Doe* were held at the Shenandoah Valley Juvenile Center ("SVJC"), "a secure juvenile detention facility in Staunton, Virginia. . .which provides education, housing, and medical care to unaccompanied immigrant children who. . .require a secure placement due to safety concerns." *Doe*, 985 F.3d at 329-30. SVJC also houses youth from surrounding jurisdictions who have been charged with a crime but have not yet had their cases adjudicated." The *Doe* Court applied the same analysis as utilized in *Patten* and held that the *Youngberg* standard governed that case. *Doe*, 985 F.3d at 339. The Court averred that the "statutory and regulatory scheme governing unaccompanied children expressly states that these children are held to give them care" and that they should "be promptly placed in the least restrictive setting that is in the best interest of the child, and any facility housing them must be "capable of providing for the child's physical and mental well-being." *Id.* (citing 8 U.S.C. § 1232(c)(2)(A), (c)(3)(A)). The plaintiff appellants in *Doe* were clearly not placed at SVJC as a consequence for a criminal or delinquent act.

Dudley also cites to *Matherly v. Andrews,* 859 F.3d 264, 268 (4th Cir. 2017), where the plaintiff, Thomas Matherly, was certified as a sexually dangerous person pursuant to the Adam Walsh Child Protection and Safety Act of 2006 (the "Adam Walsh Act") by the government. The Eastern District of North Carolina subsequently civilly committed Matherly as a sexually

dangerous person after he ended his criminal sentence. *Id.* The *Matherly* Court cited *Youngberg*, noting that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish," 457 U.S. at 421-22, and specifically held that "[b]ecause [the Adam Walsh Act] provides for *civil* commitment, the Fifth Amendment forbids subjecting an individual detained under the Adam Walsh Act to conditions of confinement which are punitive in nature." *Id.* (emphasis added).

Here, the Court should apply an Eighth Amendment analysis rather than the *Youngberg* standard because Dudley differs from the plaintiffs in *Doe*, *Matherly*, and *Patten*. The plaintiffs in those matters were unaccompanied minors, a civilly committed sex offender no longer serving a criminal sentence, and an involuntarily committed psychiatric patient. They were not individuals serving time in a secure and locked facility in response to adjudications or convictions for criminal conduct. Conversely, Dudley was adjudicated delinquent of criminal offenses and his placement in Bon Air, a Department of Juvenile Justice ("DJJ") correctional facility, was clearly a punishment imposed in response to those adjudications. *See generally* Compl. at pp. 1-3. Using the reasoning in *Patten* and *Doe*, this Court should find that Dudley is not like a civilly-committed individual, but instead a person who committed a criminal act who is receiving consequences for said criminal behavior. Second, as a resident of Bon Air, referred to in the Complaint[1] as a "correctional center," Dudley is housed in in a facility "staffed by law enforcement officials"[2] rather than a hospital employing medical professionals. *Doe*, 985 F.3d at

---

[1] Compl. at p. 1.
[2] *See* Va. Code § 66-10(9) "The Board shall have the following powers and duties. . . [t]o establish compulsory minimum entry-level, in-service, and advanced training standards, as well as the time required for completion of such training, for persons employed as juvenile correctional officers employed at a juvenile correctional facility as defined in § 66-25.3."

339 (quoting *Patten*, 274 F.3d at 840-41 (internal citations omitted)).  Third, a juvenile

committed to the Department of Juvenile Justice does not face lengthy or lifelong

confinement"—Dudley can be housed at Bon Air only until he is twenty-one years of age or for

thirty-six continuous months.  *Doe*, 985 F.3d at 339 (citing *Patten*, 275 3d. at 841); *see* Va. Code

§ 16.1-285 ("Except as provided in § 16.1-285.1, all commitments under this chapter shall be for

an indeterminate period having regard to the welfare of the juvenile and interests of the public,

but no juvenile committed hereunder shall be held or detained longer than thirty-six continuous

months or after such juvenile has attained the age of twenty-one years.").

    Dudley argues on page 10 of his Brief in Opposition that he cannot be labeled a criminal,

suggesting that *". . .the very next definition, "delinquent child," uses the phrase "child who has*

*committed a delinquent act." Va. Code. § 16.1-228.  It does not refer to the child as having*

*committed a crime or being convicted of anything."*  Brief in Opp. at p. 10 (emphasis added).

However, in this analysis, Dudley completely ignores the definitions set forth in Va. Code §

16.1-228, which provides:

> "Delinquent act" means (i) an act designated a crime under the law of the
> Commonwealth, or an ordinance of any city, county, town, or service district, or
> under federal law, (ii) a violation of § 18.2-308.7, or (iii) a violation of a court
> order as provided for in § 16.1-292, but does not include an act other than a
> violation of § 18.2-308.7, which is otherwise lawful, but is designated a crime
> only if committed by a child.").

    Moreover, the mere fact that Dudley was committed to Bon Air, a DJJ facility,

demonstrates that he was adjudicated of a criminal act.  An individual may only be committed to

the Department of Juvenile Justice if:

> (i) he is 11 years of age or older and has been adjudicated delinquent of [specific
> felonies enumerated in § 16.1-269.1(B) or (C)] or (ii) he is 14 years of age or
> older and the current offense is (a) an offense that would be a felony if committed
> by an adult, (b) an offense that would be a Class 1 misdemeanor if committed by
> an adult and the juvenile has previously been found to be delinquent based on an

offense that would be a felony if committed by an adult, or (c) an offense that would be a Class 1 misdemeanor if committed by an adult and the juvenile has previously been adjudicated delinquent of three or more offenses that would be a Class 1 misdemeanor if committed by an adult, and each such offense was not a part of a common act, transaction or scheme.

Va. Code § 16.1-278.8(A)(14); Va. Code § 16.1-269.1(B), (C).

*Reaves by Reaves v. Peace*, an unpublished opinion which Dudley also relies on to support his position that *Youngberg* should be applied, can also be distinguished from the present matter.  Civil Action No. 3:95cv640, 1996 U.S. Dist. LEXIS 7482, at *20-21 (E.D. Va. Mar. 22, 1996).  In *Reaves*, the juvenile plaintiff was charged with violating the Town of Ashland, Virginia's curfew ordinance.  1996 U.S. Dist. LEXIS 7482, at * 4.  During the hearing on the curfew violation, the Hanover County Juvenile and Domestic Relations District Court judge ordered the plaintiff to be removed from her mother's custody and placed in the custody and care of [Hanover County Department of Social Services] ("HCDSS").  *Id.* at * 5.  HCDSS then took custody of the juvenile plaintiff and placed her in the Psychiatric Institute of Richmond ("PIR").  *Id.*  At the instruction of HCDSS, the plaintiff was transferred to the facilities of United Methodist Family Services in Richmond ("UMFS") where she remained until she returned to the physical custody of her mother, with legal custody remaining with HCDSS.  *Id.* at *6.  Sometime after, HCDSS again took physical custody of the juvenile and placed her back into the UMFS facility in Richmond for a few months.  *Id.* The juvenile subsequently ran away from UMFS; when she subsequently appeared before the Hanover Juvenile and Domestic Relations District Court she was again delivered to HCDSS, and placed briefly at a holding facility known as Brookfield, where she was allegedly raped.  *Id.* at *7. She was also housed in the Jackson-Field Home ("JFH") where she was subjected to "the same type of physical, mental and cultural abuse

by the employees of JFH" that occurred at UMFS.  *Id.*   A lawsuit followed regarding the conditions of confinement at UMFS and JFH.

The *Reaves* Court noted that the Supreme Court "has not articulated the appropriate federal constitutional standard by which to measure conditions in juvenile detention facilities," but referenced the "*dicta* that 'some punishments, though not labeled criminal by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment.'" *Reaves by Reaves*, 1996 U.S. Dist. LEXIS 7482, at *18-19 (citing *Ingraham v. Wright,* 430 U.S. 651, 669 n.37, 51 L. Ed. 2d 711, 97 S. Ct. 1401 (1977) (internal citations omitted).  The *Reaves* Court found that "the Eighth Amendment's standards which, through the Fourteenth Amendment, proscribe cruel and unusual punishment in state penal institutions are inapplicable to the conditions of detention as to which the Reaves appear to be complaining."  *Id.* at *19.  It reasoned that "[t]he critical question in determining whether the Eighth Amendment or the Fourteenth Amendment is used to scrutinize claims of abusive treatment or conditions in state detention facilities is whether the plaintiff has been subjected to criminal or non-criminal detention."  The *Reaves* Court's opinion references that the plaintiff was charged with a violation of a town ordinance, but never definitively mentions if the plaintiff was adjudicated of that criminal offense.  Moreover, unlike the present matter, the *Reaves* plaintiff was never placed in the custody of the DJJ and housed in a penal institution like Bon Air—instead, she was put in the custody of the Department of Social Services and held in what appear to be family homes. Meanwhile, Dudley was clearly adjudicated delinquent and placed in Bon Air as a direct punishment for his criminal acts; thus, he has been subjected to "criminal detention."

Dudley cites to *Jennings v. Commonwealth*, 82 Va. App. 692, 700 (Va. Ct. App. 2024) (quoting *Kiracofe v. Commonwealth*, 198 Va. 833, 844 (1957)), stating that "'the primary function of juvenile courts properly considered is not conviction or punishment for crime; but crime prevention and juvenile rehabilitation.'" *Id.* (quoting *Kiracofe*, 198 Va. at 844). He also notes that "a finding of guilty on a petition charging delinquency under the provisions of this law shall not operate to impose any of the civil disabilities ordinarily imposed by conviction for a crime." Va. Code. Ann. § 16.1-308.  And, he cites language that "adjudications of delinquency do not constitute convictions of crime under Virginia law."  *United States v. Davis*,234 F. Supp. 2d 601, 605-06 (E.D. Va. 2002).  However, the fact that rehabilitation is **a**, rather than the sole, focus of juvenile justice does not change the fact that Dudley landed in Bon Air for a criminal act or acts rather than for a civil purpose, is held in a secure correctional facility with guards, and is not subject to an indeterminate commitment.  Although education, training, and mental health treatment are available to Dudley at Bon Air, and rehabilitation and lowering of recidivism are goals of DJJ, Dudley was housed there as punishment for criminal actions.  Even if the Court is persuaded by Dudley's emphasis of the difference between juvenile adjudication and adult conviction of a crime, Dudley's punishment of committed to a state correctional facility is "sufficiently analogous to criminal punishments. . . to justify application of the Eighth Amendment."

Dudley's Brief in Opp. references that he did not receive a jury trial, but his Complaint never pleads such information.  Specifically, there are circumstances where juveniles stand before a jury, and the Complaint does not provide enough information one way or another to determine whether Dudley's matters were transferred to Circuit Court pursuant to Va. Code § 16.1-269.1.  Moreover, the argument that a person not subjected to a jury trial cannot be deemed

a "criminal" falls flat when numerous individuals are convicted of crimes via bench trials or pre-trial guilty pleas.  When suggesting that the Eighth Amendment standard is "appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions," the *Ingraham* Court meant that any person housed in a secure detention facility as punishment for a crime must first receive a "formal adjudication of guilt in accordance with due process of law."  *Ingraham*, 430 U.S. 651, 671 n.40. ("As these cases demonstrate, the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.")

Thus, the proper standard for a claim brought by an individual in Dudley's position is the Eighth Amendment deliberate indifference standard.

**2.  EVEN IF *YOUNGBERG* APPLIES, DUDLEY HAS NOT SUFFICIENTLY STATED A CLAIM UNDER THAT STANDARD.**

Dudley's Complaint fails to sufficiently state a claim under *Youngberg*, because his pleading does not demonstrate that Morton's conduct represented "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person did not base the decision on such a judgment." 457 U.S. at 323.  "Liability may be imposed only when the decision by the professional" indicates a "substantial departure from accepted professional judgment."  *Doe*, 985 F.3d at 339 (citing *Youngberg* 457 U.S. at 320-23).  This evaluation mandates more than negligence; "evidence establishing mere departures from the applicable standard of care is insufficient to show a constitutional violation[.]" *Patten*, 274 F.3d at 845. The facts must show "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323. Courts do not determine the "correct" or "most appropriate" medical decision when examining this standard; instead, the

Court must evaluate whether "the decision was so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one." *Doe*, 985 F.3d at 342-43 (citing *Patten*, 274 F.3d at 845) (internal citation and quotation marks omitted).

Although the Fourth Circuit has not yet articulated the exact "difference between the standards of professional judgment and deliberate indifference," it has stated that "one difference between the two standards is that *Youngberg* does not require proof of subjective intent." *Doe*, 985 F.3d at 343 (citing *Patten*, 274 F.3d at 843 (declining to determine "how far the professional judgment standard falls from negligence on the culpability continuum")). The *Youngberg* standard is also difficult to apply in the correctional facility context because the case law utilizing such an assessment tend to refer to "medical indifference," while Dudley is alleging that Morton put him at risk of bodily harm for housing him in the infirmary for too long—essentially contending a conditions of confinement issue. *See* Compl. at p. 11; *see De'lonta v. Angelone*, 330 F.3d 630, 631 (4th Cir. 2003) (where a transgender prisoner with gender identity disorder ("GID") brought a § 1983 action alleging that the Virginia Department of Corrections ("VDOC") failed to adequately care for her serious mental health needs); *De'lonta v. Johnson*, 708 F.3d 520, 522 (4th Cir. 2013) (where the same prisoner challenged VDOC's refusal to allow her consultation for sex reassignment surgery). However, in applying *Youngberg* to a claim of unconstitutional conditions of confinement, Morton posits that the Court must determine whether the conditions provided are adequate to address an individual's needs under a relevant standard of professional judgment. *See Doe*, 985 F.3d at 344.

Dudley's Complaint does not sufficiently plead facts which would demonstrate that Morton acted inadequately to address his needs under a professional judgment standard. His Complaint demonstrates that a doctor ordered his placement in the infirmary after surgery, which

would be an appropriate placement for someone recovering from a "painful" procedure intended to repair his fractured nose.  Compl. at p. 5, ¶¶ 22-24. Dudley never claims he was deprived of food, water, a comfortable place to stay, sleep, medical treatment, entertainment, or visitation. His main complaints are minimal telephone calls, out-of-cell time, and educational programming.  But, his Complaint indicates that he was let out of his room on every day except Sundays.  Compl. at p. 6, ¶ 29.

Moreover, as to Morton, Dudley's Complaint provides only formulaic statements suggesting that Morton acted outside of professional standards without providing supporting factual statements.  *See* Compl. at p. 11, ¶ 60 ("Defendant Morton abdicated her duty to Caleb in a manner completely inconsistent with the standard of professional judgment typical of someone in her position in juvenile rehabilitation.").  Dudley's Brief in Opp. makes clear that "Plaintiff brings his claim against Defendant Morton for her direct action and inactions, not under *respondeat superior* or standard for supervisory liability…"  Brief in Opp. at p. 4, n.2.  But, the only direct involvement of Morton plead by Dudley is the assertion that "on August 10, 2023, Defendant Superintendent Stephanie Morton approved the plan to keep Caleb in the infirmary. . . without approval from the CCRC."  Compl. at p. 7, ¶ 35.  This decision cannot be considered "so completely out of professional bounds as to make it explicable only as an arbitrary, nonprofessional one," *Doe*, 985 F.3d at 342-43, when Dudley admits himself that the attack happened on August 1, 2023; he was ordered to the infirmary after surgery; and he suffered from bronchitis at the end of August 2023.  Compl. at p. 3, ¶ 10; p. 5, ¶¶ 22-23.  The only other contentions involving Morton are general—that she, "upon information and belief," possessed authority which "gave her the ability to remove Caleb from the infirmary, or otherwise remedy the unconstitutional conditions he was being subject to, at any time during his stay." Compl. at p.

7, ¶ 37. But, without additional facts supporting Morton's actual knowledge of Dudley's situation past August 10, 2023, or that the decision to keep him in the infirmary constituted "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment," such a claim should not survive a Motion to Dismiss.

### 3. DUDLEY DOES NOT PROPERLY ASSERT AN EIGHTH AMENDMENT VIOLATION AGAINST MORTON RELATED TO HIS CONDITIONS OF CONFINEMENT, AND MORTON IS ENTITLED TO QUALIFIED IMMUNITY.

Morton renews her arguments as to Dudley's Eighth Amendment claim, making only a few additional notes in response to Dudley's Brief in Opp. Again, Dudley fails to meet the requisite elements of such a cause of action. And, as discussed in section 2 herein, now knowing that he does not plan to proceed on the premise of supervisory liability, he fails to provide adequate information demonstrating that Morton was directly involved with his continued placement in the infirmary. Dudley's Brief in Opp. indicates he was held in a "cell" in the infirmary, something that is never alleged in his actual Complaint. Moreover, his summary of paragraph 29 differs in the Brief in Opp. than in the Complaint, which suggests that he received physical recreation, a haircut, and daily (except for Sunday) "Large Muscle Activity," consisting of about thirty minutes. And, although the Brief in Opp. makes many references to "solitary confinement," the Complaint itself refers to "quasi-solitary confinement." *See e.g.* Compl. at p. 5, ¶ 25.

### CONCLUSION

For the foregoing reasons, the Defendant, Stephanie Morton, respectfully requests that the Court dismiss the entirety of Dudley's Complaint against her, thereby completely dismissing

her from this action; take no action to her detriment; and to provide her any other such relief as is

necessary and appropriate under the circumstances.

<div style="margin-left: 40%;">

Respectfully submitted,

Stephanie Morton

</div>

By:   _s/  Cassandra E. Sheehan_____
<div style="margin-left: 40%;">

Cassandra E. Sheehan, VSB No. 87990
Assistant Attorney General
Office of the Attorney General
Criminal Justice & Public Safety Division
202 North Ninth Street
Richmond, Virginia 23219
Phone: (703) 359-1117
Fax: (804) 786-4239
Email: csheehan@oag.state.va.us
*Counsel for Defendant Morton*

</div>

<div style="text-align: center;">

**<u>CERTIFICATE OF SERVICE</u>**

</div>

I hereby certify that on the 21st day of April 2025, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send a notification of such filing

("NEF") to the following:

Danny Zemel
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA 23219
Email: dzemel@krudys.com

<div style="margin-left: 40%;">

_____s/ Cassandra E. Sheehan_____
Cassandra E. Sheehan, AAG, VSB No. 87990
Assistant Attorney General
Office of the Attorney General

</div>