IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| JOHN DOE, ) | |
|     Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:25CV13 (RCY) |
| ) | |
| SHERRIE DANIELLE JOYNES, *et al.*, ) | |
|     Defendants. ) | |
| ) | |

**MEMORANDUM OPINION**

This is a 42 U.S.C. § 1983 action filed by Plaintiff John Doe[1] in which he alleges constitutional violations arising from his extended placement in the infirmary at Bon Air Juvenile Correctional Center ("Bon Air"). This matter is before the Court on Defendant Stephanie Morton's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Therein, Morton moves to dismiss Plaintiff's single claim against her for unconstitutional conditions of confinement in violation of the Fourteenth Amendment, or alternatively, the Eighth Amendment. The Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons that follow, the Court will grant Morton's Motion to Dismiss.

**I. FACTUAL BACKGROUND**

Plaintiff John Doe has been held at Bon Air Juvenile Correctional Center since May 2023. Compl. ¶ 7, ECF No. 1. Bon Air is a "juvenile rehabilitative institution" that provides "quality education, treatment, and rehabilitation and re-entry supports" to its residents. *Id.* ¶ 8. Defendant

---

[1] The Court granted Plaintiff's Motion to Proceed Anonymously on November 12, 2025. *See* ECF No. 30.

Stephanie Morton was an employee of the Virginia Department of Juvenile Justice ("DJJ") and served as the Superintendent at Bon Air. *Id.* ¶ 6.

On the morning of August 1, 2023, Plaintiff was assaulted by other Bon Air residents in the office of Defendant Sherrie Joynes, who served as a Community Coordinator for DJJ. *Id.* ¶ 10. Upon observing visible signs of the attack on Plaintiff's face, a provider at Bon Air arranged for Plaintiff to be taken to the medical department for evaluation. *Id.* ¶ 20. The assault resulted in Plaintiff needing a "painful surgery on his nose to fix the fracture from the assault." *Id.* ¶ 22. Plaintiff had bruising around his eyes for weeks following the attack and experienced severe pain following the surgery. *Id.*

A Bon Air physician initially ordered Plaintiff to be admitted to the infirmary for his injuries sustained during the August 1, 2023 assault. *Id.* ¶ 23. On August 10, 2023, the Institutional Classification and Review Committee ("ICRC"), the body responsible for managing Plaintiff's housing, met to discuss his safety plan. *Id.* ¶¶ 30, 33. Plaintiff's safety plan "implied transferring [Plaintiff] to another facility," and staff were to follow up with alternative placements, including a community placement, in the coming weeks. *Id.* ¶ 33. After voting on this plan, the ICRC forwarded it for approval to the Central Classification and Review Committee ("CCRC"), which is the body responsible for approving case management decisions. *Id.* ¶ 34. Outside of this process, and also on August 10, 2023, in "an action purportedly taken pursuant to a DJJ policy allowing for 'emergency' transfers" and without the approval of the CCRC, Morton separately approved a plan to keep Plaintiff in the infirmary. *Id.* ¶ 35.

On August 29, 2023, after Plaintiff's surgery and post-operation follow-up, while still in the infirmary, Plaintiff experienced acute bronchitis, unrelated to the assault or surgery. *Id.* ¶ 23. Plaintiff was treated for his bronchitis by a Bon Air physician and experienced no complications

2

thereafter.  *Id.*  However, despite his improved prognosis, Plaintiff was ultimately kept in the infirmary through February 2024—six months after his assault.  *Id.* ¶ 24.

Plaintiff describes the conditions in the infirmary as amounting to "quasi-solitary confinement," where Plaintiff was not afforded most of the services provided to Bon Air residents.  *Id.* ¶¶ 24, 27.  Plaintiff did not receive adequate recreation time, educational programming, or the mandated number of phone calls per week while housed in the infirmary.  *Id.* ¶ 28.  Plaintiff was only released for recreational activity three times during his six-month infirmary stay, and when he was otherwise let out, for "Large Muscle Activity," it was only for less than one hour, and he generally spent it watching TV.  *Id.* ¶ 29.

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint on January 10, 2025.  Compl., ECF No. 1.  In response, on March 14, 2025, Defendant filed the instant Motion to Dismiss.  Mot. Dismiss, ECF No. 13; Mem. Supp. Mot. Dismiss ("Mem. Supp."), ECF No. 14.  Plaintiff filed his Opposition to the Motion to Dismiss on April 7, 2025.  Resp. Opp'n, ECF No. 17.  Defendant submitted her Reply on April 22, 2025.  Reply, ECF No. 24.

## III. STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)).  Importantly, Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp.*

3

*v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). And while the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* (citations omitted). The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993) (citations omitted); *see also Martin*, 980 F.2d at 952.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient to plausibly state a claim. *Id*.

## IV. ANALYSIS

As an initial matter, the Court must determine whether Plaintiff's § 1983 claim falls within the ambit of the Fourteenth Amendment or the Eighth Amendment. The Court then turns to assessing whether Plaintiff has stated a claim against Defendant Morton under the appropriate standard. Ultimately, the Court finds that Plaintiff has not.

### A. Plaintiff's Claim Falls Under the Eighth Amendment

Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (internal quotation omitted). Thus, the § 1983 analysis "begins by identifying the specific constitutional right allegedly infringed" by the defendant. *Id*. A § 1983 action cannot lie if the plaintiff fails to demonstrate an underlying constitutional violation. *See id*. Here, Plaintiff asserts that Defendant Morton's conduct—subjecting Plaintiff to a six-month quasi-solitary infirmary stay—violated his Fourteenth Amendment rights or, alternatively, his Eighth Amendment rights. Compl. ¶¶ 57–63.

The Fourteenth Amendment prohibits violations of substantive due process. *Sacramento v. Lewis*, 523 U.S. 833, 841 (1998). A litigant articulates such a violation by alleging "an abuse of executive power . . . clearly unjustified by any legitimate objective." *Id*. ("The Due Process Clause . . . was intended to prevent [the] government 'from abusing [its] power, or employing it as an instrument of oppression.'" (quoting *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992))). The Supreme Court, however, has consistently instructed that substantive due process rights cannot serve as a catch-all category for governmental conduct that is more specifically controlled by a different amendment. *Collins*, 503 U.S. at 125. Thus, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Sacramento*, 523 U.S. at 842 (internal citation omitted). Accordingly, Plaintiff cannot bring a § 1983 action based on the Fourteenth Amendment if the alleged violations are more explicitly addressed by a different amendment— here, the Eighth Amendment, which prohibits cruel and unusual punishment.

Notwithstanding the fact that Plaintiff pleaded Count IV in the alternative as an Eighth Amendment claim, *see* Compl. 10, Plaintiff argues that "[t]he Eighth Amendment standard applicable to convicted adult criminals is not appropriate for claims brought by a juvenile detainee," Resp. Opp'n 2. In support of his position, Plaintiff first argues that, because juveniles can be convicted without a jury of their peers, they are "not entitled to the full panoply of constitutional rights" in their adjudicative proceedings and thus they "cannot" subsequently fall under the penal umbrella of the Eighth Amendment. *Id.* Plaintiff further argues that, "because juvenile detention in Virginia is rehabilitative," not punitive, Plaintiff's claim should be construed in the same manner the United States Supreme Court construed a challenge to the conditions of confinement for an individual who was involuntarily committed. *Id.* (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982)).

With respect to Plaintiff's first argument, he cites nothing to support his sweeping claim that "[t]he Eighth Amendment standard applies *only* to individuals who have been criminally convicted by a governmental entity and were, during that process, entitled to the full panoply of constitutional protections." Resp. Opp'n 2 (emphasis added).[2] Moreover, as Defendant points out, Plaintiff's assertion that Plaintiff "was not entitled to have his case heard by a jury of his peers," *see id.*, injects a new fact into the case that was not pleaded in the Complaint, *see* Reply 8–9, and therefore the Court declines to accept this questionable assertion[3] as a basis for deviating

---

[2] Plaintiff subsequently cites *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021), for the asserted proposition that "[c]laims brought by *criminally convicted adults* are evaluated under the Eighth Amendment's cruel and unusual punishments clause." Resp. Opp'n 4 (emphasis added). But the *Mays* opinion contains no such bright line qualifier and instead simply notes that, because Mays "was a 'pretrial detainee and not a convicted prisoner,' the Fourteenth Amendment, and not the Eighth Amendment, govern[ed] his claim," given that, "[a]s a pretrial detainee, Mays cannot be subject to any form of 'punishment.'" *Mays*, 992 F.3d at 300 (first citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988), and then citing *Belcher v. Oliver*, 898 F.2d 32, 34 (4th Cir. 1990)).

[3] The Court labels it "questionable" because, again as remarked by Defendant and as otherwise judicially noticed, there are instances where a juvenile *can* have their case presented to a jury. *See, e.g.*, Va. Code Ann. § 16.1-272 ("Power of circuit court over juvenile offender—A. In any case in which a juvenile is indicted, the offense for

from the facially applicable Eighth Amendment standard. While the Court recognizes that the Supreme Court has purposefully avoided characterizing juvenile delinquency adjudications as purely criminal, *see McKeiver v. Pennsylvania*, 403 U.S. 528, 541, 551 (1971), the Court is not persuaded by the proposition that the potential absence of a jury would automatically take Plaintiff outside the ambit of the Eighth Amendment. Indeed, there are many instances where adults are criminally convicted absent a jury,[4] where they may nevertheless claim the protections of the Eighth Amendment in their subsequent confinement.

Perhaps most fatal for Plaintiff's argument is the Supreme Court's pronouncement in *Ingraham v. Wright*, that "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees *traditionally associated with criminal prosecutions*." 430 U.S. 651, 671–72 n.40 (1977) (emphasis added). This process-focused qualification stands in stark contrast with Plaintiff's attempt to draw a bright-line rule that the Eighth Amendment is only triggered by (1) a criminal prosecution, (2) of an adult, (3) involving "the full panoply of constitutional protections." Resp. Opp'n 2. The *Ingraham* decision makes clear that the defining line between application of the Eighth and Fourteenth Amendment protections is whether the state "has secured a formal adjudication of guilt *in accordance with due process of law*." 430 U.S. at 671–72 n.40 (emphasis added). "Where the State seeks to impose punishment *without* such an

---

which he is indicted and all ancillary charges shall be tried in the same manner as provided for in the trial of adults, except as otherwise provided with regard to sentencing."); *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (courts "'may properly take judicial notice of matters of public record,' including statutes" (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009))).

[4] E.g., when they take a bench trial, or enter a guilty plea, or even in military prosecutions. *See McKeiver*, 403 U.S. at 543 ("But one cannot say that in our legal system the jury is a necessary component of accurate factfinding" (and thus fundamental fairness as required by due process)—"[j]uries are not required, and have not been, for example, in [*inter alia*] military trials."); *id.* at 547 ("The Court specifically has recognized by dictum that a jury is not a necessary part even of every criminal process that is fair and equitable." (citing *Duncan v. Louisiana*, 391 U.S.145, 149–50, n.14, and 158 (1968))).

adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Id.* (emphasis added). Because the Supreme Court has elsewhere held that a juvenile's delinquency adjudication comports with due process even absent a jury, *see McKeiver*, 403 U.S. at 543, 545, Plaintiff's argument—that because he lacked a jury of his peers, "the Eighth Amendment standard cannot be appropriate for reviewing his claims," Resp. Opp'n 2—necessarily fails.

The *Ingraham* decision also obviates the need for the Court to engage with the parties' *Youngberg* arguments. Whether or not the prevailing *goal* of juvenile detention is rehabilitation or punishment, the fact remains that juveniles are not sent to detention facilities absent an adjudication of guilt.[5] *See* Reply 5–6 (quoting Va. Code § 16.1-278.8(A)(14); Va. Code § 16.1-269.1(B), (C), for the sole circumstances under which a juvenile may be committed to a Department of Juvenile Justice facility). And again, the *McKeiver* decision affirms that juvenile delinquency adjudications, even absent a jury, comport with due process. Thus, because detention in a juvenile facility necessarily constitutes a punishment resulting from "a formal adjudication of guilt in accordance with due process of law," *Ingraham*, 430 U.S. at 671–72 n.40, "the pertinent constitutional guarantee is the [Eighth] Amendment," *cf. id.*; *accord Morales v. Turman*, 562 F.2d

---

[5] Obviously, the Court is referring to the normal course of juvenile delinquency detentions and not, as was at issue in *Doe v. Shenandoah Valley Juvenile Center Commission*, when juvenile detention centers are used to house juveniles who have *not* been adjudged delinquent. *See* 985 F.3d 327 (4th Cir. 2021). The Court's holding in this case accordingly aligns with the Fourth Circuit's pronouncement in *Doe v. Shenandoah Valley Juvenile Center Commission*, that "the nature of the facility is not dispositive," and further that "[t]he nature of the facility is secondary to the reason a person is confined in it." *Id.* at 941. Here, the Court's holding regarding the applicability of the Eighth Amendment unconstitutional confinement standard is *not* based on the nature of Bon Air, but on the reason Plaintiff was confined there—because he was adjudicated delinquent after committing an act designated a crime by the law of Virginia. *See* Va. Code Ann. §§ 16.1-228, 16.1-278.8(A)(14), 16.1-269.1(B), (C).

993, 998 n.1 (5th Cir. 1977) ("The [E]ighth [A]mendment applies to juvenile detention centers as well as to adult prisons.").[6]

Accordingly, having determined that Plaintiff's claim should be assessed within the framework of the Eighth Amendment, the Court proceeds to its consideration of whether Plaintiff has stated a claim.

### B. Eighth Amendment Standard

The Eighth Amendment protects those adjudged to have committed a crime from "cruel and unusual punishments" for said crime. U.S. Const. amend. VIII. Under Eighth Amendment jurisprudence, a prisoner may seek relief from the conditions of confinement based on a "sufficiently serious" deprivation of a basic human need by a prison official who is acting with a "sufficiently culpable state of mind." *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991). This calls for a two-part inquiry, asking (1) "whether confinement conditions inflict harm that is, 'objectively, sufficiently serious' to deprive prisoners of 'the minimal civilized measure of life's necessities,'" and (2) "whether officers subjectively acted with 'deliberate indifference to inmate health or safety' because they knew of but disregarded the inhumane treatment." *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834, 838 (1994)).

---

[6] The Court acknowledges that the Supreme Court in *Ingraham* sidestepped the precise question of "whether or under what circumstances persons involuntarily confined in mental or juvenile institutions can claim the protection of the Eighth Amendment." 430 U.S. at 669 n.37. Nevertheless, the Court is confident that juvenile detention following from a finding of guilt—concurrent with which the juvenile defendant was accorded the protections of due process—falls within the category of "punishments, though not labeled 'criminal' by the State, [that] may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment." *Id.*

### C. The Circumstances and Conditions Alleged Do Not Amount to an Eighth Amendment Violation

For his § 1983 claim against Defendant Morton, Plaintiff asserts "that Defendant Morton was aware of the serious risk of harm to Plaintiff from holding him in the infirmary for an extended period of time but responded to that knowledge with deliberate indifference." Compl. ¶ 61.[7] Plaintiff's factual allegations in support of this claim amount to the following:

- While housed in the infirmary for approximately six months, he was "not afforded most of the services promised to [Bon Air] residents" and his experience "amounted to quasi-solitary confinement." *Id*. ¶¶ 25, 27.

- He was deprived of "adequate recreation time, educational programming, or the mandated number of calls per week." *Id*. ¶ 27.

- Plaintiff was left in his room all day and not allowed to do anything. *Id*. ¶ 28.

- Plaintiff was only released for specifically designated recreational time on three occasions, for 20 minutes each time. *Id*. ¶ 29.

- Plaintiff reports not being let out of his room whatsoever on Sundays, contrasted with having been typically let out for 45 minutes on Sundays, in his usual unit. *Id*.

- On days he was allowed out, it was for "Large Muscle Activity," for one hour or less. *Id*.

- He was lonely due to limited phone access and experienced physical, psychological, and emotional harm from the lack of any meaningful programming in the infirmary. *Id*. ¶ 28.

- During Plaintiff's infirmary stay, Dr. Mims, a clinical psychologist and member of the Institutional Classification and Review Committee ("ICRC"), came to see Plaintiff at least twenty times. *Id*. ¶¶ 30, 32.

- Plaintiff also had regular contact with on-call Behavioral Service Unit staff. *Id*. ¶ 28.

- Defendant Morton approved the plan to keep Plaintiff in the infirmary in August of 2023, and, pursuant to her role as Superintendent at Bon Air, she maintained the authority to remove Plaintiff from the infirmary or otherwise remedy his living conditions throughout his prolonged infirmary stay. *Id*. ¶¶ 35–36.

---

[7] The Court omits the portions of Count IV tailored to Plaintiff's attempted Fourteenth Amendment articulation of his claim.

10

Defendant argues that these allegations fail to satisfy the requisite elements of an Eighth Amendment claim. Mem. Supp. Mot. Dismiss 8. The Court agrees.

To begin with the objective prong of the Eighth Amendment inquiry, Plaintiff's conditions of confinement in the infirmary do not amount to a "sufficiently serious" deprivation of a basic human need. "To be 'sufficiently serious,' the deprivation must be 'extreme'—meaning that it poses a 'serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of serious harm resulting from . . . exposure to the challenged conditions.'" *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)). While the Fourth Circuit has held that "solitary confinement in itself can cause severe enough harm to implicate the Eighth Amendment," *Thorpe*, 37 F.4th at 933, this conclusion was drawn based on the conditions of solitary confinement on Virginia's death row and at Virginia's "supermax" facilities, where the state "deprive[d] prisoners of nearly all environmental and sensory stimuli and of nearly all human contact for 22–24 hours a day," *id.* at 930.

Here, Plaintiff argues that his claim satisfies the objective prong because he has alleged prolonged solitary confinement involving restrictions that "combined to deprive [him] of the basic human need of social interaction." Resp. Opp'n 13. However, in making this argument, Plaintiff strategically revises the allegations from the Complaint to render them more analogous to the conditions experienced by supermax and death row inmates. Specifically, Plaintiff for the first time asserts that he was kept in a "cell" for twenty-three or more hours a day. *Id.* In asserting that "[h]e was released from the infirmary on only three occasions for twenty minutes each time, *id.* (citing Compl. ¶ 29), Plaintiff whitewashes out of the Complaint the allegation that, with the exception of Sundays, he was "let out of his room for what Bon Air referred to as 'Large Muscle

11

Activity,'" *see* Compl. ¶ 29. And while the Response in Opposition claims that Plaintiff "was held for six months without exercise, education, or socialization," Resp. Opp'n 13 (citing Compl. ¶¶ 24–27), the Complaint merely alleges that Plaintiff "was not afforded *most* of the services promised to residents," as he "did not receive *adequate* recreation time, educational programming, or the mandated number of phone calls per week," Compl. ¶ 27 (emphases added). While Plaintiff is correct that, when faced with a 12(b)(6) motion, the Court must draw all reasonable inferences in favor of Plaintiff, doing so does not involve allowing Plaintiff to re-write the Complaint by way of briefing. *Hurst v. District of Columbia*, 681 F. App'x 186, 194 (4th Cir. 2017) (holding that "a plaintiff may not amend her complaint via briefing") (citing *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988)); *see also Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Although the confinement described in the Complaint does sound bleak, it does not paint the same picture of "extreme" deprivation contemplated by the Fourth Circuit in *Thorpe* and *Porter*, where prisoners were "deprive[d] . . . of nearly all environmental and sensory stimuli and of nearly all human contact for 22–24 hours a day." *See Thorpe*, 37 F.4th at 931–32 (describing the "concerning confinement conditions" at Virginia's supermax facilities, to include: cells smaller than a parking space; steel doors lined with solid strips, which halt communication with others; opaque windows obscuring the outside *and* inside of the prison; bright lights that stay on all day and night; only perfunctory interactions with mental-health professionals; one hour of non-contact visitation per week, a shower three times a week, and one hour of exercise a day in a small cage—but they must agree to a cavity search each time they wish to leave their cells; and the denial of "*all* productive activities, save for the Challenge Series workbooks that are supposed to aid

prisoners' progress through Step Down[8]." (emphasis in original)); *Porter*, 923 F.3d at 353–54 (describing death row inmate conditions involving cells "one-half the size of a parking space," with "a window that is 5 inches high by 41.5 inches long, . . . covered by a wire mesh . . . . Each cell's door is made of solid steel, includes a tray slot that is bolted shut when not in use, and a 'rectangular in-set window that allow[s] inmates to look outside their cell into the pod,'" in addition to lighting, exercise, visitation, and staff-contact conditions similar to those described in *Thorpe*). Accepting the proposition that what is "extreme" for a juvenile should amount to a lesser standard than what is extreme for an adult, *see* Resp. Opp'n 12–13, the Court nevertheless does not find that Plaintiff's infirmary stay, *as alleged in the Complaint*, objectively posed "a substantial risk of serious harm resulting from . . . exposure to the challenged conditions." *Scinto*, 841 F.3d at 225.

Moreover, even if the Court were to accept Plaintiff's contention that the conditions of his confinement to the infirmary satisfied the objective prong of the Eighth Amendment inquiry, the claim would fail on the subjective prong. To show that Defendant Morton subjected Plaintiff to the conditions of his confinement with a "sufficiently culpable state of mind," the facts must bear out that she "knew of but disregarded the inhumane treatment." *Thorpe*, 37 F.4th at 933. The allegations in the Complaint do not plausibly give rise to such a conclusion.

Specifically, Plaintiff alleges that Superintendent Morton "approved the plan to keep [Plaintiff] in the infirmary" in August of 2023. Compl. ¶ 35. That is it. There are no allegations regarding Morton's awareness of or involvement in Plaintiff's continuing infirmary confinement, past that point—simply that, as superintendent, she ostensibly had the power and authority to *end*

---

[8] This program "help[s] progress prisoners to lower security levels through a system of incentives and periodic reviews." *Thorpe*, 37 F.4th at 931.

the confinement "or otherwise remedy the unconstitutional conditions [Plaintiff] was being subject[ed] to." *Id.* ¶ 37. The Court disagrees with Plaintiff's argument that "there is sufficient circumstantial evidence in the Complaint to draw the inference that Defendant Morton was aware of [Plaintiff's] condition and aware that her inaction might put him at a substantial risk of harm." Resp. Opp'n 17. To the contrary—there is no circumstantial evidence on the face of the Complaint to suggest that Defendant Morton was aware on Plaintiff's ongoing infirmary stay. Her position as Superintendent alone does not plausibly render her all-knowing about the status of every resident at Bon Air.

Although Plaintiff alleges that "the ICRC met at least five times to discuss his housing status and to create a "Safety Plan" during his six-month hold in the infirmary, *id.* ¶ 31, there is no allegation that Superintendent Morton participated in or was briefed on these discussions. Again, Plaintiff's brief tries to expand upon the allegations in the Complaint to somehow impute the ICRC's activities and knowledge to Defendant Morton. *See* Resp. Opp'n 17 ("The number and ongoing nature of meetings by the ICRC about [Plaintiff's] housing indicates that Defendant Morton and her colleagues understood the harm they were perpetuating."). Contrary to the inference Plaintiff would have the Court draw, the Court finds that the *reasonable* inference available from the allegations in the Complaint is that Defendant Morton signed an emergency infirmary-hold directive for Plaintiff while the ICRC was still awaiting final approval from the CCRC, and that this action was merely a stop-gap measure to ensure Plaintiff's safety while awaiting final plan approval from the CCRC. *See* Compl. ¶¶ 33–35 (describing how the ICRC met and voted on Caleb's safety plan on August 10, 2023, and forwarded its plan to the CCRC for

approval, and that *also on August 10*, Defendant Morton approved the plan to keep Plaintiff in the infirmary pursuant to a policy allowing for emergency transfers[9]).

Accordingly, the Court concludes that, from her single alleged point of involvement immediately following his assault, it is impossible to plausibly infer that Superintendent Morton "knew of but disregarded" Plaintiff's months-long languishment. As such, Plaintiff has failed to plead facts sufficient to support a finding of deliberate indifference on the part of Defendant Morton, and on that basis, too, Count IV fails.[10]

## V. CONCLUSION

For the reasons stated above, the Court will grant Defendant Morton's Motion to Dismiss. An appropriate order shall issue.

/s/ RCY
Roderick C. Young
United States District Judge

Date: March 11, 2026
Richmond, Virginia

---

[9] The Complaint makes no reference to an eventual decision or action from the CCRC. If anything, the ICRC's repeated meetings and Plaintiff's ongoing confinement suggest that the CCRC did not, in fact, approve the ICRC's initial recommendation.

[10] The Court does not even reach the question of whether there was a legitimate penological justification for subjecting Plaintiff to his conditions of confinement, e.g., isolating him from the other juvenile detainees who assaulted him in the first place. While a legitimate penological justification can serve as a counterweight to a finding of knowing inaction in the subjective prong assessment, *see Porter*, 923 F.3d at 362–63 ("[I]f a prison official reasonably determines that, notwithstanding the emotional and psychological risks, prolonged solitary detention of an inmate is necessary to protect the well-being of prison employees, inmates, and the public, then confinement of the inmate in such conditions will not violate the Eighth Amendment."), the issue is moot because of the utter absence of allegations upon which the Court could infer Defendant Morton's awareness of Plaintiff's ongoing situation.