UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOHN DOE,

        Plaintiff,

                                     Civil Action No.: 3:25-cv-00013

v.

                                   **JURY TRIAL DEMANDED**

SHERRIE DANIELLE JOYNES, and

STEPHANIE MORTON,

        Defendants.

**AMENDED COMPLAINT**

Plaintiff John Doe, by counsel, moves this Court for Judgment against Defendants Sherrie Joynes and Stephanie Morton.

Despite no wrongdoing, John Doe, a teenager, spent six months confined alone in a cell the size of a parking space. He spent twenty-three or more hours a day in this cell, with the lights on and no one to talk to. Defendant Stephanie Morton, the then-Superintendent of the Bon Air Juvenile Correctional Center ("Bon Air"), kept him there. She left him there despite the obvious and mounting toll the extreme isolation took on his young psyche. Ignoring the consensus of correctional and medical experts, Defendant Morton kept a teenager in solitary confinement for half a year, causing severe psychological harms that John Doe continues to endure today.

John Doe was first placed in solitary confinement in the infirmary after an attack that Defendant Sherrie Danielle Joynes facilitated. Using her position as a community coordinator, Defendant Joynes summoned John Doe into her office and watched as other residents brutally

attacked him. In the aftermath of the attack, John Doe was placed in solitary confinement in the infirmary. The medical need for him to be there soon disappeared. But Defendant Morton nevertheless approved and maintained John Doe's confinement in the infirmary for approximately six months under highly restrictive conditions that deprived him of basic human needs, denied him meaningful exercise, programming, and social contact, and caused serious physical and psychological harm.

John Doe suffered the very harms that courts, the United States Department of Justice, medical authorities, and correctional-health experts have long recognized as the predictable consequence of prolonged isolation, especially for children. John Doe's half year in solitary will affect him for the rest of his life.

## I.    JURISDICTION

1.    Jurisdiction exists in this case pursuant to the Eighth and Fourteenth Amendments of the U.S. Constitution, 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 1331, 1343. Further, this Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims.

2.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

3.    Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this Division—specifically, in Chesterfield County.

## II.    PARTIES

4.    Plaintiff JOHN DOE is, and was at all relevant times, a resident of the Commonwealth of Virginia.

2

5. At all times relevant hereto, Defendant SHERRIE DANIELLE JOYNES was a Community Coordinator with the Virginia Department of Juvenile Justice working within the scope of her employment at the Bon Air Juvenile Correctional Center. Defendant Joynes is sued in her individual capacity.

6. At all times relevant hereto, Defendant STEPHANIE MORTON was an employee of the Virginia Department of Juvenile Justice serving as the Superintendent at Bon Air Juvenile Correctional Center. Defendant Morton is sued in her individual capacity.

## III.    FACTS

7. John Doe was held at Bon Air from May 2023 to March 2026. Bon Air is a secure juvenile correctional facility operated by the Virginia Department of Juvenile Justice ("DJJ") for the custody of children committed there. Unlike an adult prison, Bon Air is supposed to provide youth with treatment, education, structured programming, and rehabilitation in addition to secure confinement. At all relevant times, John Doe was confined at Bon Air and was wholly dependent on Bon Air staff and officials for his safety, housing, medical care, education, movement, and daily living needs.

8. John Doe came to Bon Air after a childhood marked by abuse and substance use. He attempted suicide at a young age.

9. John Doe has been diagnosed with bipolar disorder, anxiety disorder, disruptive mood dysregulation disorder, conduct disorder, and attention deficit hyperactivity disorder. The information about John Doe's past abuse and substance use and his diagnoses were in his individual service plan, created pursuant to 6VAC35-71-790.

3

10.    John Doe relied exclusively on Bon Air programming, treatment, and support necessary for his rehabilitation. His past psychiatrists had indicated that he required a "high[] level of care."

**A.    The attack on John Doe.**

11.    On August 1, 2023, Defendant Community Coordinator Sherrie Joynes called John Doe into her office.

12.    When he entered, he encountered a group of residents already in her office. Defendant Joynes was sitting behind her desk, looking at her phone. She instructed the other residents to shut the door. Defendant Joynes did nothing as residents began to taunt John Doe.

13.    The assault quickly turned physical, with one resident putting his arms around John Doe to restrain him while the others began to attack.

14.    While the residents repeatedly punched John Doe in the face and body, Defendant Joynes continued to sit behind her desk, making no attempt to protect John Doe from the assault herself or to call for assistance.

15.    The attack left John Doe bloody and unconscious.

16.    When John Doe regained consciousness, his right eye would not open and his nose was profusely bleeding. A resident was still restraining him. John Doe heard Defendant Joynes tell the attackers to "Get all this blood out of [her] office," or words to that effect. At Defendant Joynes' instruction, the attackers changed John Doe's bloody clothes, gave him a new shirt, and threw away his shirt and socks. They also tried to wipe the blood off his face.

17.    Not only did Defendant Joynes not call for help, she prevented any help from arriving and intervening. While the attackers cleaned up after the assault, Defendant Joynes ensured that no Bon Air staff were able to access her office. As John Doe finished wiping the blood

4

from his face, a Bon Air staff member knocked on Defendant Joynes' office door. She told the attackers to "not let her in" and tried to send the staff member away.

18.    Defendant Joynes then told John Doe to leave the office and tossed a Honeybun at him on his way out.

19.    According to residents interviewed after the incident, this was not the first assault facilitated by Defendant Joynes.

20.    That afternoon, Dr. Ralston Mims, a clinical psychologist, came to Unit 64 to see John Doe for individual therapy.

21.    The fresh physical trauma on John Doe's face prompted questions from Dr. Mims. John Doe informed him about the assault and told him that Defendant Joynes had taken no action to protect him or provide him medical care. Dr. Mims later arranged for John Doe to be taken to the medical department for an evaluation. Defendant Joynes never reported the assault herself, nor did she arrange for John Doe to obtain medical care.

22.    John Doe was interviewed by a representative from DJJ and an investigation began.

23.    John Doe needed surgery to repair the nasal fracture he sustained from the assault. The bruising and swelling around his eyes lasted for weeks, leaving him in severe pain.

24.    Following the assault, Bon Air initially housed John Doe in the infirmary for treatment of injuries related to the assault.

25.    The Bon Air campus is a former girls' preparatory school with multiple buildings spread out across the campus. The infirmary is in its own building separate from the buildings where the Residents spend their time.

26.    John Doe later experienced an episode of acute bronchitis on or about August 29, 2023, for which he received treatment.

5

27.     After that treatment, John Doe had no continuing medical need requiring infirmary housing.

28.     Nevertheless, John Doe remained housed in the infirmary, in a solitary cell, from August 2023 until February 2024.

**B.      John Doe's solitary cell and daily life.**

29.     John Doe spent approximately six months confined in a small rectangular cell, no more than approximately twelve (12) feet in any direction.

30.     The metal frame bed occupied most of the cell. The only other item in the room was a heater attached to the wall under the window.

31.     The lights stayed on the entire time. At night they would be dimmed somewhat, but they were still light enough that John Doe could read it he wanted to do so. John Doe did not experience darkness for six months.

32.     The cell had no toilet.

33.     The cell had no sink.

34.     To use the bathroom, John Doe had to ask staff to escort him. His request would often be denied or delayed. Each day for six months, John Doe was forced to hold his urine, often for hours, while he waited for correctional staff to allow him to use the bathroom.

35.     John Doe's access to a shower was also controlled by staff. During lockdowns at Bon Air, which occur often, he could shower only once every seventy-two (72) hours.

36.     Under the Virginia Administrative Code, Bon Air residents must have the opportunity for a daily shower.

6

37.    He only received one haircut—a basic personal hygiene service provided more regularly to the general population—during his time in solitary. His ungroomed hair contributed to his overall mental and physical decline while in the infirmary.

38.    His solitary cell's window was caged and obscured, limiting any outside light that could come in. The window was so obscured that he could not see outside.

39.    John Doe spent approximately twenty-three (23) hours a day alone in that cell for six months.

40.    According to Bon Air's regulations, John Doe was supposed to receive one hour of physical activity each day. That often would not occur.

41.    Even when John Doe was let out of his cell for his one hour of exercise, he was not permitted meaningful exercise, movement, or recreation. Instead, staff required John Doe to sit and watch television in a small area at the front of the infirmary for less than an hour. If he stood up, paced, or attempted to exercise, he was told by staff to sit down.

42.    John Doe was only allowed to leave the infirmary building twice during his six-month confinement.

43.    The entire six months he was in the infirmary, John Doe received meaningful exercise twice, in the form of two walks: once from the infirmary to the library, and once around the Bon Air campus.

**C.    John Doe's social interactions while in solitary confinement.**

44.    In addition to being denied the ability to exercise his body, John Doe was deprived of social stimulation as well.

45.    Even at the rare times when there were other residents or staff in the infirmary, loud machines were constantly running, making communication difficult or impossible.

7

46.     When another resident was in the infirmary, they would not be let out at the same time as John Doe.

47.     John Doe—a still-developing teenager—spent six months without any meaningful peer interaction. He received one family visit and one legal visit during the six months he spent in solitary confinement.

48.     Although he had limited contact with staff acting in their official roles—including visits from Dr. Mims and other behavioral health staff—that contact was episodic, role-based, and no substitute for ordinary social interaction, companionship, or participation in the normal life of the facility.

49.     The Virginia Administrative Code's summary of the Department of Juvenile Justice states that Bon Air "is responsible for juveniles committed to DJJ, ensuring that they receive treatment and educational services while in a safe and secure setting." 6VAC35 (Agency Statement). It also states that programs within Bon Air "offer community reintegration and specialized services in a secure residential setting." *Id*.

50.     John Doe was also shut out of almost all educational and related programming at Bon Air. During his time in solitary, he was only able to do limited computer-based work with a teacher once or twice. Otherwise, he received no meaningful schooling or educational programming.

51.     His phone access was also restricted.

52.     At most, John Doe was able to make one call per week while in solitary confinement. Residents in the Bon Air general population receive multiple calls per week.

**D.    It is well-known that solitary confinement is harmful, especially for youth.**

53.    Solitary confinement is now broadly understood to impose grave psychological and physiological harms, especially where it entails near-total social isolation, sensory deprivation, and confinement in a cell for twenty-two (22) or more hours per day.

54.    The Department of Justice has concluded that, although separation may sometimes be necessary for safety, restrictive housing should be used rarely, only for a specific penological purpose, and for no longer than necessary because "[t]he stakes are high." U.S. Dep't of Just., *Report and Recommendations Concerning the Use of Restrictive Housing* 1–2 (2016), *available at* https://www.justice.gov/dag/file/815551/dl    [https://perma.cc/CGF6-6TGF]    (addressing restrictive housing in adult correctional settings). Nor should restrictive housing ever be used "as a default solution." *Id*. at 2.

55.    As far back as 1890, the American court system has recognized this truth as well. In the familiar case of *In re Medley*, the Supreme Court noted that even after a short period of solitary confinement, many prisoners fell "into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others, still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community." 134 U.S. 160, 168 (1890).

56.    As the Fourth Circuit summarized in 2022, "Even judicial precedent has long noted the deleterious effects of complete sensory deprivation." *Thorpe v. Clarke*, 37 F.4th 926, 935 (4th Cir. 2022).

57.    The medical and psychiatric literature reaches the same conclusion. *See* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & POL'Y 325, 325–27,

9

333–37 (2006) (describing severe psychiatric sequelae associated with isolation, including hallucinations, panic, paranoia, cognitive impairment, and self-destructive behavior); Craig Haney, *Restricting the Use of Solitary Confinement*, 1 ANN. REV. CRIMINOLOGY 285, 286–92, 300–01 (2018) (describing a substantial body of research documenting serious psychological harm and a growing consensus to restrict or eliminate the practice).

58.     These harms are more pronounced for youth whose brains are still developing. The American Academy of Child and Adolescent Psychiatry has explained that the "potential psychiatric consequences of prolonged solitary confinement are well recognized and include depression, anxiety and psychosis." Am. Acad. of Child & Adolescent Psychiatry, *Policy Statement on Solitary Confinement in Juvenile Carceral Settings* (April 2025), *available at* https://www.aacap.org/aacap/Policy_Statements/2025/Solitary_Confinement_Juvenile_Carceral_ Settings.aspx [https://perma.cc/K8UT-CL42].

59.     AACAP further explains that "[d]ue to their developmental vulnerability, juvenile offenders are at particular risk of such adverse reactions," and that "the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement." Am. Acad. of Child & Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders* (April 2012), *available at* https://www.aacap.org/aacap/policy_statements/2012/solitary_confiners.aspx [https://perma.cc/2DQZ-THEZ] (citing Jeff Mitchell & Christopher Varley, *Isolation and Restraint in Juvenile Correctional Facilities*. 29 J. AM. ACAD. CHILD ADOLESC. PSYCHIATRY 251 March 1990).

60.     The risk is even greater for juveniles and adults, like John Doe, who enter custody with preexisting mental health conditions. The National Commission on Correctional Health Care has explained that persons with mental illness are "particularly vulnerable" to the harms of solitary

10

confinement, and that their underlying conditions are often worsened rather than managed in isolation. Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)* 2, 5 (2016), *available at* https://www.ncchc.org/wp-content/uploads/Solitary-Confinement-Isolation.pdf [https://perma.cc/9CRN-BV7Z]. The Commission accordingly recommends that juveniles and mentally ill individuals be excluded from solitary confinement altogether. *Id.* at 5.

61.     Demonstrating the widespread agreement among both medical and correctional experts, the American Academy of Child and Adolescent Psychiatry, the American Psychological Association, the American Public Health Association, the National Commission on Correctional Health Care, and the American Bar Association have all called for a ban on solitary confinement for children, and the American Correctional Association has acknowledged that "isolating a youth for extended periods can have serious psychological and developmental consequences."[1]

62.     By 2023, when John Doe was placed in isolation, the serious harm caused by prolonged isolation of youth was not obscure, novel, or debatable. It was well established and

---

[1] *See* Am. Acad. of Child & Adolescent Psychiatry, *Policy Statement on Solitary Confinement in Juvenile Carceral Settings* (Apr. 2025), *available at* https://www.aacap.org/aacap/Policy_Statements/2025/Solitary_Confinement_Juvenile_Carceral_Settings.aspx [https://perma.cc/K8UT-CL42]; Am. Psych. Ass'n, Resolution Opposing Involuntary Individual Isolation of Youth in Juvenile Justice Settings (2024), https://www.apa.org/about/policy/isolation-youth.pdf [https://perma.cc/739N-QBKL]; Am. Pub. Health Ass'n, *Solitary Confinement as a Public Health Issue* (Nov. 5, 2013), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/14/13/30/solitary-confinement-as-a-public-health-issue [https://perma.cc/7KZS-M652]; Nat'l Comm'n on Corr. Health Care, *Restrictive Housing in Juvenile Settings* (2021), https://www.ncchc.org/position-statements/restrictive-housing-in-juvenile-settings-2021 [https://perma.cc/P36S-NH69]; Am. Bar Ass'n Crim. Just. Section & Comm'n on Youth at Risk, *Report to the House of Delegates* (Aug. 2017), https://www.americanbar.org/content/dam/aba/administrative/youth_at_risk/end-solitary-confinement-policy.pdf [https://perma.cc/98S3-W9ZY].

widely recognized by the United States Department of Justice, leading child-psychiatric authorities, correctional-health authorities, and the scientific literature. Virginia-specific reporting had also recognized the serious harms of prolonged isolation and the need for reform. ACLU of Virginia, *Silent Injustice: Solitary Confinement in Virginia* 18–22 (2018), *available at* https://www.acluva.org/app/uploads/2018/05/aclu-va_solitary_confinement_report_2018_single-paged_-_final.pdf [https://perma.cc/UAC5-E6NY].

**E.      The harm solitary confinement imposed on John Doe.**

63.      The near-total isolation, lack of movement, lack of social contact, lack of education and programming, and confinement to a cell caused John Doe to deteriorate physically and mentally.

64.      Moreover, his history of trauma and documented mental health issues heightened the devastating consequences solitary confinement had on him.

65.      John Doe lost the motivation to do anything.

66.      He slept away large portions of the day.

67.      He became physically deconditioned and out of shape.

68.      He became increasingly angry, irritable, and unable to control his emotions.

69.      He was always angry and easily set off by small things while in solitary.

70.      With nothing to distract or occupy his mind, he was forced to continuously relive the attack on him.

71.      Once an avid reader, John Doe was unable to focus on books as his mind began to deteriorate.

72.      With no school, exercise, or social interaction, John Doe felt there was no reason to be awake. He asked staff for more medication so he could sleep away his days.

12

Case 3:25-cv-00013-RCY    Document 34-1    Filed 04/20/26    Page 13 of 22 PageID# 597

73.     As the solitary confinement wore on, John Doe's sleep became erratic. He developed insomnia when not aided by medication, and that insomnia continues to this day.

74.     Unsurprisingly, John Doe began to experience disturbances in his perception that frightened him. He experienced:

      a.   Sleep paralysis.

      b.   Episodes in which he heard his mother or grandmother speaking to him.

      c.   Times he believed he was speaking to someone only to realize they were not there.

75.     While John Doe is no longer in solitary and no longer at Bon Air, the problems caused by his time in solitary have not gone away.

76.     He continues to struggle with insomnia. He cannot be alone for extended periods of time. And although his perceptual disturbances are less acute than before, they still recur.

77.     John Doe's time in solitary confinement, shut off from all social stimulation, will stay with him.

**F.     Defendant Morton's knowledge of John Doe's condition.**

78.     The administrative body responsible for managing John Doe's housing situation was the Institutional Classification and Review Committee ("ICRC").

79.     On August 10, 2023, the ICRC met to discuss John Doe's safety plan. This conversation would have included a discussion John Doe's individual service plan, created pursuant to 6VAC35-71-790. That service plan included information about John Doe's past abuse, substance abuse, and mental health diagnoses.

80.     That safety plan contemplated follow-up regarding alternative placements, including potential transfer to a Community Placement Program within two weeks.

13

81.    Decisions by the ICRC are reviewed by the Superintendent, Defendant Morton. Each ICRC agenda has a space for the "Superintendent's Disposition" next to each action item.

82.    On or about August 10, 2023, Morton approved John Doe's continued placement in the infirmary pursuant to what was purported to be an emergency transfer mechanism.

83.    John Doe's confinement in the infirmary did not end shortly after that approval. It continued for months thereafter.

84.    Over the course of John Doe's stay in the infirmary, the ICRC met at least five times to discuss his housing status and to create and maintain a safety plan.

85.    Dr. Mims, a member of the ICRC, visited John Doe in the infirmary at least twenty times during John Doe's confinement there.

86.    During those visits, John Doe raised serious concerns about the daily conditions to which he was subjected in the infirmary. Upon information and belief, Dr. Mims relayed those concerns to the ICRC.

87.    Upon information and belief, Defendant Morton would have learned about those concerns in her review.

88.    In his interactions with staff, John Doe expressed frustration with his lack of programming and lack of phone access.

89.    John Doe expressed that he was lonely because of his limited phone access and isolation.

90.    John Doe also expressed that he wanted medication that would make him groggy so he could sleep the day away.

91.     John Doe's prolonged solitary detention in the infirmary, and its effects on him, were well known among the small Bon Air community (during the time John Doe was in solitary, Bon Air had on average 155 residents).

92.     Demonstrative of how well-known John Doe's situation was, in Spring 2024, an outside consultant retained by DJJ to evaluate staffing issues at Bon Air identified as a matter of concern that one resident "was housed in the infirmary for non-medical reasons." *Va. Dep't of Juv. Just., Bon Air Juv. Corr. Ctr. Culture & Safety Assessment Report* 24 (Spring 2024), *available at* https://ewscripps.brightspotcdn.com/14/dc/3e78afd5422dbafb3e9237495fab/cultural-assessment-vadjj-redacted.pdf [https://perma.cc/XW6D-6SHP].

93.     The report further stated that the resident was "housed in the infirmary for behavioral reasons" and had, at the time of the assessment, "been in the infirmary for four months." *Id*. That resident was John Doe.

94.     The assessment was based on an onsite visit from January 31 through February 1, 2024, and included structured observations, interviews with agency and facility leadership and management staff members (including Defendant Morton), staff focus groups, and discussions with incarcerated youth.

95.     The consultant treated this placement as unusual and specifically recommended that Bon Air "[f]ind alternative placement for long-term housing or isolation to address behavioral concerns instead of the infirmary."

96.     Virginia's administrative regulations also required that Defendant Morton be aware of John Doe's plight.

97.     Title Six, Agency Thirty-Five, Chapter Seventy-One, Part Six of the Virginia Administrative Code governs the operations of Juvenile Correctional Centers, of which Bon Air is

the only one in Virginia. These code provisions required that Defendant Morton have knowledge of John Doe's plight while he was held alone in the infirmary.

98.     6VAC35-71-815(A) requires that a daily log be maintained documenting any "significant happenings or problems experienced by residents."

99.     6VAC35-71-800(A) requires that all residents have their individual service plans reviewed every three months. Subsection (C) requires that the produced report from that review be distributed to the appropriate facility staff. Individual service plans are required under 6VAC35-71-790. The information about John Doe's history of abuse and his diagnoses were a part of his individual service plan.

100.    6VAC35-71-110(A) requires that the "superintendent or designee shall meet, at least monthly, with all department heads and key staff members." Those department heads and key staff members would, upon information and belief, include the staff members working at the infirmary and the doctors and mental health professionals interacting with John Doe.

101.    6VAC35-71-110(B) mandates that the superintendent "shall visit the living units and activity areas at least weekly to encourage informal contact with employees and residents and to observe informally the facility's living and working conditions" at a minimum once a month.

102.    6VAC35-71-1110(E) requires that confinement of a resident "for longer than 24 hours must be reviewed at least once every 24 hours by the superintendent or a designee who was not involved in the incident."

103.    6VAC35-71-1140(D) requires that "If a resident is confined to a locked room for more than 24 hours, the superintendent or designee shall be notified." And subsection (F) requires that the "Superintendent or designee shall have contact with each resident who is confined each day of confinement" that exceeds 24 hours.

104. The Virginia Office of the State Inspector General has reported that, when a resident is confined at Bon Air, the primary tools used to document resident well-being are confinement monitoring forms and bound monthly logbooks maintained in each unit. Va. Off. of the State Inspector Gen., *Bon Air Juvenile Correctional Center Audit Report* 14 (Dec. 5, 2025), *available at* https://www.osig.virginia.gov/media/governorvirginiagov/office-of-the-state-inspector-general/pdf/DJJ-Bon-Air-Audit-Report.pdf [https://perma.cc/GY8L-8YKR].

105. Given those reporting, logging, review, and contact requirements, John Doe's months-long confinement in the infirmary was not the kind of event that could occur without repeated notice to Superintendent Morton.

106. Morton, as Superintendent, had the power to remove John Doe from the infirmary or otherwise remedy the harmful conditions of his confinement.

107. But Defendant Morton took no action to ameliorate his condition.

## IV.    COUNTS

<u>**COUNT I**</u>
**Gross Negligence**
**(Against Defendant Joynes)**

108. Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

109. Defendant Joynes owed affirmative duties to John Doe.

110. Defendant Joynes' actions and inactions, described in this Amended Complaint, show such a level of indifference to John Doe so as to constitute an utter disregard of prudence, amounting to a complete neglect for John Doe's safety.

17

111.    Additionally, the accumulation of Defendant Joynes' negligent acts demonstrates recklessness towards, or total disregard for, John Doe.

112.    As a direct and proximate result of Defendant Joynes' gross negligence, John Doe sustained the injuries and damages previously described in this Amended Complaint.

113.    Defendant Joynes' gross negligence towards John Doe's safety establishes a cause of action for monetary relief consisting of compensatory damages and costs to the Plaintiff.

## COUNT II
### Willful and Wanton Negligence
### (Against Defendant Joynes)

114.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

115.    Defendant Joynes owed affirmative duties to John Doe.

116.    Defendant Joynes was willfully and wantonly negligent in that she acted, or failed to act, with conscious disregard for John Doe's rights. Defendant Joynes' actions demonstrate her reckless indifference to the injuries that John Doe sustained.

117.    As a direct and proximate cause of Defendant Joynes' willful and wanton negligence, John Doe suffered the severe injuries and damages outlined in this Complaint.

118.    Defendant Joynes' willful and wanton negligence towards John Doe's safety and security establishes a cause of action for monetary relief consisting of compensatory damages, punitive damages, and costs to the Plaintiff.

18

## COUNT III
### Failure to Protect
**Fourteenth Amendment (or, in the alternative, Eighth Amendment as incorporated by the Fourteenth Amendment)[2] / 42 U.S.C. § 1983 (Against Defendant Joynes)**

119.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

120.    Defendant Joynes, at all times acting under color of state law and in her individual capacity, deprived John Doe of his rights under the Eighth Amendment to the United States Constitution by acting with deliberate indifference to a known and substantial risk of serious bodily harm.

121.    As an employee of Bon Air, Defendant Joynes owed all residents, including John Doe, an affirmative duty of care.

122.    Defendant Joynes knew or should have known that the group of residents in her office may attack John Doe, and she knew unequivocally that John Doe was at risk of serious bodily harm during the attack. Yet Defendant Joynes took no action to protect John Doe; in fact, she actively prevented his protection, exhibiting a severe deviation from the standards of professional judgment (or, in the alternative, deliberate indifference to the known risk of the attack and subsequent injury).

123.    As a direct and proximate result of Defendant Joynes' deviation from the standards of professional judgment (or deliberate indifference), John Doe was injured in various respects,

---

[2] Plaintiff contends that as a juvenile committed for rehabilitation purposes, his federal civil rights claims (Counts III and IV) related to his detention are properly analyzed under the Fourteenth Amendment Due Process Clause and the professional judgment standard set out by the Supreme Court in *Youngberg v. Romero*, 457 U.S. 307 (1982). However, in the alternative, Plaintiff also meets the deliberate indifference standard of the Eighth Amendment.

19

including, without limitation, suffering physical injuries, pain and suffering, and severe mental anguish and trauma due to Joynes' egregious failure to take any action to protect him.

124.    All the injuries detailed in this Complaint are attributable to the deprivation of John Doe's constitutional rights guaranteed by the Fourteenth (or Eighth) Amendment to the U.S. Constitution and protected under 42 U.S.C. § 1983.

125.    Defendant Joynes' actions demonstrate a callous indifference to John Doe's constitutional rights, entitling him to punitive damages.

126.    Defendant Joynes' violation of the Fourteenth (or Eighth) Amendment to the U.S. Constitution establishes a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages, punitive damages, attorneys' fees, and costs to the Plaintiff.

## COUNT IV
### Conditions of Confinement
**Fourteenth Amendment (or, in the alternative, Eighth Amendment as incorporated by the Fourteenth Amendment) / 42 U.S.C. § 1983**
**(Against Defendant Morton)**

127.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

128.    Defendant Morton, acting under color of state law, deprived John Doe of his constitutionally protected rights under the Fourteenth (or Eighth) Amendment of the United States Constitution by violating her affirmative duties to provide him with constitutionally adequate conditions of confinement.

129.    The Fourteenth Amendment to the U.S. Constitution creates affirmative duties for administrators in a rehabilitative setting, such as Bon Air, to provide reasonable, safe conditions

20

of confinement. The Eighth Amendment to the U.S. Constitution requires that incarcerated people not be held in conditions that amount to cruel and unusual punishment.

130. By holding John Doe in the infirmary for six months and maintaining an abject lack of meaningful services, Defendant Morton abdicated her duty to John Doe in a manner completely inconsistent with the standard of professional judgment typical of someone in her position in juvenile rehabilitation.

131. In the alternative, Plaintiff alleges that Defendant Morton was aware of the serious risk of harm to Plaintiff from holding him in the infirmary for an extended period of time but responded to that knowledge with deliberate indifference.

132. As a direct and proximate result of Defendant Morton's actions and inactions, John Doe suffered physical injury, pain and suffering, mental anguish, emotional distress, and ongoing psychological harm, as described in this Complaint.

133. Defendant Morton's actions demonstrate a callous indifference to John Doe's constitutional rights, entitling him to punitive damages.

134. Defendant Morton's violation of the Fourteenth (or Eighth) Amendment to the U.S. Constitution establishes a cause of action, pursuant to 42 U.S.C. § 1983, for monetary relief consisting of compensatory damages, punitive damages, attorneys' fees, and costs to the Plaintiff.

## V. JURY TRIAL DEMANDED

135. Plaintiff demands that all issues of fact in this case be tried to a properly impaneled jury to the extent permitted under the law.

## VI. PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants Sherrie Joynes and Stephanie Morton, award compensatory damages in the amount of

21

$500,000 and punitive damages in the amount of $250,000, or greater amounts to be determined at trial, as well as costs (including attorneys' fees for the federal civil rights claims), and grant such other and further relief that the Court may deem appropriate.

<div style="margin-left:50%;">

Respectfully submitted,

JOHN DOE,

By:_____/s/ Danny Zemel___
          Counsel

</div>

Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, Virginia 23219
Phone: (804) 774-7950
Email: dzemel@krudys.com

Maisie Osteen, Esq. (VSB# 98736)
LEGAL AID JUSTICE CENTER
626 E. Broad Street, Suite 200
Richmond, Virginia 23219
Phone: (434) 825-3697
Email: maisie@justice4all.org

*Counsel for Plaintiff*

22