**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

JOHN DOE,

        Plaintiff,

                                          Civil Action No. 3:25-cv-13

v.

STEPHANIE MORTON, *et al*.

        Defendants.

**Plaintiff's Memorandum in Support of his Motion to Amend his Complaint**

Plaintiff John Doe seeks leave to file an Amended Complaint under Federal Rule of Civil

Procedure 15(a)(2). John Doe spent almost a half a year in solitary confinement as a teenager after

being assaulted by fellow residents at the Bon Air Juvenile Correctional Center. The proposed

amendment addresses the issues identified in this Court's March 11, 2026 Memorandum Opinion

and Order by adding factual allegations relevant to the seriousness of John Doe's prolonged

solitary confinement and to Defendant Morton's knowledge of, and deliberate indifference to, the

harm that confinement caused. Because the case remains at the pleadings stage, no discovery has

occurred, and the proposed amendment is neither prejudicial nor futile, granting leave to amend

would be in the interest of justice.

**Factual and Procedural Background**

John Doe had, to put it mildly, a rough childhood. He suffered abuse and turned to

substances at a young age. ¶ 8.[1] He attempted suicide at one point. ¶ 8. He has been diagnosed

with bipolar disorder, anxiety disorder, disruptive mood dysregulation disorder, conduct disorder,

---

[1] Unless otherwise noted, all paragraph citations are to the proposed Amended
Complaint, ECF 34.1, which was attached to the Motion to Amend. ECF 34.

and attention deficit hyperactivity disorder. ¶ 9. Staff at the Bon Air Juvenile Correctional Center ("Bon Air"), where he was held from May 2023 to March 2026, ¶ 7, included these diagnoses and the information about his history in John Doe's individual service plan, which Virginia regulations required Bon Air to create. ¶ 9.

John Doe spent six months in solitary confinement as a teenager at Bon Air. In August 2023 he was placed in solitary in the infirmary after he was attacked by fellow residents at Bon Air. ¶¶ 11–19, 24. The attack occurred in the office of Defendant Sherrie Joynes, a community coordinator at Bon Air. ¶¶ 11–14. Defendant Joynes called John Doe into her office that day and then sat and watched while he was beaten and left bloody and unconscious. ¶¶ 14–15. Defendant Joynes made no effort to aid John Doe and, instead, prevented others from intervening by keeping staff from seeing what was happening. ¶ 17. Nor did she provide medical assistance. ¶ 21. Instead, she tossed a pastry at John Doe as he left her office. ¶ 18. John Doe did not get medical assistance until a clinical psychologist saw him for individual therapy that afternoon and noticed the obvious physical trauma on John Doe's face. ¶¶ 20–21. John Doe needed surgery on his nose and had bruising and swelling around his eyes that lasted for weeks. ¶ 23.

Once in the infirmary, John Doe was housed in a small cell by himself with only a metal frame bed and a heater. ¶¶ 29–30. For the next six months he would stay there, even though any medical need for that placement had evaporated within a month. ¶¶ 26–28. During that time, he had to ask permission to use the bathroom and often had to wait long periods of time before he was able to do so. ¶ 34. At night, his lights were never off, so he did not experience darkness. ¶ 31. While dimmed at night, the lights were still bright enough that he could read. ¶ 31. He could

2

not see outside. ¶ 38. He spent approximately twenty-three hours alone per day in that cell. ¶ 39.[2] And even when he was let out of his cell, all he was allowed to do was sit and watch TV by himself; if he tried to pace or exercise, staff told him to sit back down. ¶ 41.

John Doe was also cut off from social interaction during this time. He could not communicate with fellow residents even when one was in the infirmary in a different cell. ¶¶ 45–47. His educational opportunities were almost entirely eliminated and his access to phone calls was limited. ¶¶ 50–52. His only interactions were with staff acting in their official roles. ¶ 48. These extreme conditions soon began to cause him problems. His prior trauma and documented mental health conditions only exacerbated the harms. ¶¶ 8–9.

Stuck in extreme isolation, John Doe quickly became listless and began to sleep through large portions of the day. ¶¶ 65-68. He asked for additional medication so that he could remain asleep for even longer periods. ¶ 72. With nothing to distract or occupy his mind, he could not stop reliving the attack on him. ¶ 70. He could not focus on books and stopped reading. ¶ 71. His sleep became erratic and he experienced serious perception issues including sleep paralysis and auditory hallucinations. ¶¶ 73–74. John Doe had episodes where he heard people speaking to him who were not there. ¶ 74. Many of these issues, while they have lessened with time, continue to affect John Doe even after leaving Bon Air. ¶¶ 76–77.

John Doe's placement in the infirmary was approved by Defendant Morton, the then-Superintendent of Bon Air. ¶ 82. The group responsible for managing John Doe's housing situation, the Institutional Classification and Review Committee ("ICRC"), continued to meet

---

[2] Plaintiff's prior Complaint was inartfully drafted by undersigned counsel on this point, which led to what appeared to be a disconnect between Plaintiff's Complaint and his briefing in opposition to Defendant Morton's motion to dismiss. *See* ECF 31, at 11-12 (discussing ECF 1, ¶ 29).

approximately monthly while he was in the infirmary. ¶ 84. Defendant Morton, if not in attendance at those meetings, had to sign off on each action item discussed by the ICRC. ¶ 81. One member of the ICRC, Dr. Mims, visited John Doe in the infirmary at least weekly during his time in solitary confinement. ¶¶ 85–86. Dr. Mims was well aware of John Doe's deteriorating condition and would have relayed that to the ICRC. ¶ 86.

John Doe's situation in the infirmary was well known on the small Bon Air campus. ¶¶ 91–92. An outside consultant retained by DJJ to evaluate staffing issues at Bon Air noted in their report that a resident was being held in the infirmary "for behavioral reasons" and had been there "for four months." ¶ 93. The consultants learned this information through "structured observations, interviews with agency and facility leadership and management staff members (including Defendant Morton), staff focus groups, and discussions with incarcerated youth." ¶ 94. The report specifically recommended that Bon Air not use the infirmary for behavioral concerns—suggesting it was likely discussed in the meetings between Defendant Morton, other Bon Air staff, and the consulting firm. ¶ 95.

Lastly, numerous state regulations govern the daily activities at Bon Air that would have required Defendant Morton to be kept apprised of John Doe's situation. ¶¶ 97–105. Most relevant here, regulations govern how residents at Bon Air may be confined in locked rooms and what should be done when they are confined. ¶¶ 102–103. The superintendent, or their designee, must be notified if a resident is confined in a locked room for more than a day. ¶ 103. And the superintendent or their designee must have contact with that resident *every day* the resident is so confined. ¶ 103.

On January 10, 2025, John Doe filed a Complaint asserting claims for gross negligence and willful and wanton negligence against Defendant Joynes and federal civil rights claims against

4

Defendants Joynes and Morton. ECF 1. Defendant Morton filed a motion to dismiss, ECF 13, that was granted on March 11, 2026. ECF 31. Defendant Joynes did not file a motion to dismiss. Plaintiff now seeks leave to file an Amended Complaint. Both Defendants, by counsel, stated that they opposed the Motion to Amend the Complaint.

## Applicable Standard

Federal Rule of Civil Procedure 15(a)(2) states that "a party may amend its pleading only with the opposing party's written consent or the court's leave," and that "[t]he court should freely give leave when justice so requires." *Id*. The Fourth Circuit has interpreted this to mean that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). Whether prejudice or bad faith exists is within the discretion of the district court. *Davison v. Randall*, 912 F.3d 666, 690 (4th Cir. 2019). But whether a proposed amendment is futile is a question of law. *Id*.

## Argument

Rule 15(a) is a forgiving standard intended to facilitate the resolving of claims on the merits. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (discussing Rule 15 and stating, "if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."). Only if there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." should leave be denied. *Id*. Following that guidance, the Fourth Circuit has stated that as a general rule, when a claim is dismissed on a motion to dismiss, "the court normally will give plaintiff leave to file an amended complaint." *Ostrzenski v.*

*Seigel*, 177 F.3d 245, 252 (4th Cir. 1999) (quoting 5A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 360-67 (2d ed. 1990)). Neither Defendant provided detail about why their objected to Plaintiff's Motion for Leave to Amend, so Plaintiff will address all three potential issues: bad faith, prejudice, and futility.

Plaintiff's proposed Amended Complaint alleges sufficient facts to plausibly claim that John Doe suffered a sufficiently serious deprivation of his right to humane living conditions, that Defendant Morton was aware of the substantial risk to John Doe's well-being, and that she responded to that risk with deliberate indifference. The proposed Amended Complaint also alleges sufficient facts to states claims for state law gross and willful and wanton negligence, as well as failure to protect in violation of the Eighth Amendment, against Defendant Joynes based on her failure to take any action while she watched John Doe be assaulted in her office.

Plaintiff has moved promptly after this Court dismissed his claim against Defendant Morton and this case has yet to progress beyond the pleadings stage. Accordingly, this Court should abide by the federal policy that supports resolving cases on their merits and grant Plaintiff's Motion to Amend his Complaint because there is no prejudice to the Defendants, Plaintiff has not acted in bad faith, and the amendment would not be futile.

## I.     Plaintiff's attempt to amend is not in bad faith and does not prejudice the Defendants.

"[T]he further a case progresses before judgment is entered, the more likely it is that the amendment will prejudice the defendant or that a court will find bad faith on the plaintiff's part." *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (cleaned up). For instance, filing an amended complaint on the "eve of the deadline for dispositive motions" that would have required the reopening of discovery can be prejudicial. *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 603 (4th Cir. 2010). Conversely, when a case has not progressed beyond the pleadings stage, as is

6

true here, it is unlikely any prejudice could exist. And while not determinative, the "absence of prejudice…will normally warrant granting leave to amend." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980).

Plaintiff has acted diligently and, because no discovery has yet occurred, Defendants would not be prejudiced. This Court granted Defendant Morton's motion to dismiss on March 11, 2026. ECF 32. Plaintiff's counsel immediately began strategizing potential next steps to discuss with Plaintiff. Because Plaintiff was still at Bon Air at the time, communication with him was slow. After speaking with Plaintiff and discussing the options, he agreed that seeking to file an amended complaint was the best choice, and counsel began drafting one. Counsel drafted the proposed Amended Complaint as quickly as possible, Plaintiff reviewed it, and counsel then emailed it to Defendants' counsel on April 10, 2026 to obtain their position on a motion to amend. Less than a month elapsed between the Order dismissing Defendant Morton and Plaintiff sending a proposed Amended Complaint to the Defendants' counsel. After learning that the Defendants would not consent, Plaintiff expeditiously drafted the current motion to ensure this Court could address the issue before the case progressed further. Plaintiff has acted in good faith and there is no prejudice to the Defendants.

## II.    Plaintiff's proposed Amended Complaint would survive a motion to dismiss and therefore is not futile.[3]

Plaintiff's proposed Amended Complaint contains four claims. Three are against Defendant Joynes: state law gross negligence and willful and wanton negligence and failure to protect in violation of the Eighth Amendment. Defendant Joynes watched John Doe get assaulted

---

[3] The court may also choose to forego this step and instead address the claims in the proposed Amended Complaint in the context of dispositive motions. *See Taylor v. Revature LLC*, No. 1:22-cv-1153, 2024 U.S. Dist. LEXIS 156859, *3 (E.D. Va. Aug. 30, 2024).

by other residents and took no action. She even acted to prevent other staff from finding out what was happening. Those actions meet the requirements of all three claims against Defendant Joynes.

The final claim is one for deliberate indifference to unconstitutional conditions of confinement in violation of the Eighth Amendment against Defendant Morton. The conditions of confinement John Doe was subjected to while he was in the infirmary subjected him to a substantial risk of harm. And, in fact, did harm him. Further, there is sufficient circumstantial evidence to infer that to Defendant Morton was aware of John Doe's condition and responded to that knowledge with deliberate indifference.

### A. Plaintiff is not contesting at this stage that the Eighth Amendment standard applies here.

In its opinion granting Defendant Morton's motion to dismiss, this Court ruled that the Eighth Amendment standard of deliberate indifference should apply to Plaintiff's federal civil rights claims against Defendants Joynes and Morton. ECF 31, at 5–9. Plaintiff is not contesting that here because it is law of the case. *See Fusaro v. Howard*, 19 F.4th 357, 367 (4th Cir. 2021) (defining law of the case as the doctrine "posit[ing] that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"). This Court's determination that the Eighth Amendment standard applies to John Doe's claims governs at this stage. Plaintiff has pled the Fourteenth Amendment standard in the alternative in the proposed Amended Complaint solely as not to waive that argument for purposes of any future potential appeals. Accordingly, here Plaintiff will assess the civil rights claims using the Eighth Amendment's deliberate indifference standard.

### B. John Doe's claims against Defendant Joynes are not futile.

The proposed Amended Complaint contains three claims against Defendant Joynes: gross negligence and willful and wanton negligence under Virginia law; and failure to protect in

violation of the Eighth Amendment (as incorporated against the states by the Fourteenth Amendment). Each would easily survive a motion to dismiss.

Gross negligence is "such a degree of negligence as would shock fair minded [people] although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 92 (1971). Gross negligence is judged using an objective standard. *See Cowan v. Hospice Support Care, Inc.*, 268 Va. 482, 487 (2004). Willful and wanton negligence is "action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Kaltman v. All American Pest Control, Inc.*, 281 Va. 483, 494 (2011) (quoting *Alfonso v. Robinson*, 257 Va. 540, 545 (1999)). Both gross and willful and wanton negligence are questions of fact usually reserved for the jury. *Elliott v. Carter*, 292 Va. 618, 622 (2016).

To state a failure to protect claim under the Eighth Amendment, a plaintiff must demonstrate that they suffered, or were at a substantial risk of suffering, a serious physical or emotional injury. *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014). And a plaintiff must demonstrate that the defendant official responded to that substantial risk with deliberate indifference. *Id*. at 346–47.

The proposed Amended Complaint details how Defendant Joynes sat and watched while John Doe was beaten bloody and unconscious. ¶¶ 14-16. Defendant Joynes was aware of the attack on John Doe because it happened in front of her, in her office, and she told the attackers to "[g]et all this blood out of [her] office." ¶ 16. She did not try to help John Doe herself, nor did she call for help. She actually prevented other staff from helping John Doe. ¶ 17. Lastly, after the attack, Defendant Joynes did not obtain medical care for John Doe or report the assault. ¶ 21.

A reasonable jury could find that John Doe's nasal fracture, bruising, and swelling constitutes a serious physical injury. Further, that jury could find that Defendant Joynes watching this attack and doing nothing constitutes deliberate indifference. That jury could also find that her actions shock the consciousness and demonstrate a reckless indifference to the safety of John Doe, constituting gross and willful and wanton negligence under Virginia law. The proposed Amended Complaint states sufficient facts as to all three counts against Defendant Joynes.

### C.    John Doe's claims against Defendant Morton are not futile.

Only one claim exists against Defendant Morton in the proposed Amended Complaint: that she subjected John Doe to unconstitutional conditions of confinement. As this Court stated, this claim has two prongs: (1) whether the conditions complained of inflicted harm that is "objectively, sufficiently serious" and (2) whether the defendant officials "knew of but disregarded the inhumane treatment." ECF 31, at 9 (quoting *Thorpe v. Clarke*, 37 F.4th 926, 933 (4th Cir. 2022)) (internal citation omitted). In addressing the original complaint, this Court held that Plaintiff had not met the second prong and likely would not meet the first either. ECF 31, at 13. Plaintiff's proposed Amended Complaint contains further facts demonstrating that Plaintiff did suffer an objectively serious deprivation and that Defendant Morton was aware of his condition and responded with deliberate indifference.

### 1.    John Doe's conditions during his six months in solitary confinement were sufficiently serious to state an Eighth Amendment claim.

Under Supreme Court precedent, "contemporary notions of decency" require that prisoners be provided with "life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). Whether a deprivation of those necessities is "sufficiently serious" in turn depends on whether it "resulted in serious or significant physical or emotional injury." *Strickler v. Waters*, 989 F.2d 1375, 1381 (4th

Cir. 1993).[4]  Where a prisoner alleges several different deprivations, each of which may not rise to a sufficiently serious level to establish a constitutional deprivation independently, courts may consider the degree to which the separate conditions "interact" with each other to create a "deprivation of a single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991).

The Fourth Circuit recently addressed the objective prong for conditions of confinement claims in depth. In *Bolick v. Anderson*, the plaintiff alleged that for two separate occasions each lasting about five months, he "was not permitted to leave his cell to engage in physical exercise, despite suffering from serious physical disabilities that required exercise for rehabilitation." 2026 U.S. App. LEXIS 7488, *1 (4th Cir. March 13, 2026). The Fourth Circuit held that the plaintiff had met the objective prong. In doing so, the court highlighted the fact that the test is whether the conditions imposed were sufficiently serious *as to that plaintiff*, not in the abstract. As the panel put it:

> A deprivation of the same length might pose a substantial risk of serious harm to an incarcerated individual—like Bolick—who is unable to exercise inside his cell due to his physical condition and the small size of the cell, but pose no such risk to another individual who, for example, is able-bodied and resides in a large cell.

*Id.* *13–14. *See also Thomas v. Younce*, 604 F. Appx. 325 (4th Cir. 2015) (a prisoner with a medical condition requiring that he be assigned to a bottom bunk stated an Eighth Amendment claim because he was forced to be on the top bunk, even if that would not have been sufficiently serious for other prisoners).

---

[4] Contemporary notions of decency also require treating children different from adults. *See Roper v. Simmons*, 543 U.S. 551 (2005) (outlawing the death penalty for crimes committed when the person was juvenile); *Graham v. Florida*, 560 U.S. 48 (2010) (sentencing a juvenile offender to life in prison without the possibility of parole for a nonhomicide crime constitutes cruel and unusual punishment); *Miller v. Alabama*, 567 U.S. 460 (2012) (mandatory life in prison for juvenile homicide offenders violates the Eighth Amendment). The same should apply here. It is merely another thread of the idea that the objective prong analysis is plaintiff-specific.

Here, the deprivations John Doe suffered would be sufficiently serious as to any individual. But if there were any doubt, his status as a teenager with mental health issues means the conditions of confinement he was subjected to were sufficiently and especially serious as to him.

In *Thorpe,* the Fourth Circuit held that allegations of near-constant cell confinement, barriers to communication, constant illumination, rare visitation, denial of productive activity, and severe psychological harm were sufficient to satisfy the objective prong. *Thorpe v. Clarke*, 37 F.4th 926, 931–32, 942 (4th Cir. 2022). John Doe alleges the same essential features here. Like the plaintiffs in *Thorpe*, he spent approximately twenty-three hours a day alone in his cell. ¶39. Like the plaintiffs in *Thorpe*, he was subjected to extreme social isolation and deprived of meaningful human contact: he spent six months without meaningful peer interaction, received only one family visit, and had sharply restricted phone access. ¶¶ 47, 51. Like the plaintiffs in *Thorpe*, he was forced to live under constant illumination[5]; and his caged, obscured window prevented any meaningful view outside. ¶¶ 31, 38. Like the plaintiffs in *Thorpe*, he was denied productive activity, including meaningful education and programming, and he was afforded no meaningful exercise or recreation. ¶¶ 40–41, 50. And like the plaintiffs in *Thorpe*, he alleges serious psychological harm resulting from prolonged isolation. ¶¶ 75–77. Indeed, in some respects John Doe's allegations are more severe: unlike the conditions described in *Thorpe*, his cell had no toilet or sink, and for months his requests to use the bathroom were often delayed or denied for hours. ¶¶ 32–35.

The seriousness of these conditions is even clearer as applied to John Doe himself. As noted above, the objective inquiry is plaintiff-specific and turns on the totality of the

---

[5] The lights in the room were dimmed at night but were still bright enough that John Doe could read if he desired. ¶ 31.

circumstances. *See Bolick v. Anderson*, 2026 U.S. App. LEXIS 7488, at \*12–13 (4th Cir. Mar. 13, 2026). John Doe was a teenager in a juvenile correctional facility, not an able-bodied adult in an adult prison. ¶¶ 4, 7, 47. He entered Bon Air after a childhood marked by abuse and substance use, with a prior suicide attempt and documented diagnoses of bipolar disorder, anxiety disorder, disruptive mood dysregulation disorder, conduct disorder, and attention deficit hyperactivity disorder. ¶ 9.[6]

Against that backdrop, six months of near-total isolation, constant illumination, virtually no meaningful peer interaction, virtually no meaningful education, limited movement, and no exercise posed an especially serious risk of harm to him. Those risks soon materialized. John Doe lost motivation, slept away large portions of the day, became physically deconditioned, grew increasingly angry and unable to regulate his emotions, lost the ability to focus on books, asked staff for more medication so he could sleep through the day, developed insomnia, and began experiencing sleep paralysis and perceptual disturbances. ¶¶ 54–77. That is enough to plead a deprivation sufficiently serious as to John Doe. *See Porter v. Clarke*, 923 F.3d 348, 357 (4th Cir. 2019) (ruling that spending years "between 23 and 24 hours a day 'alone, in a small . . . cell' with 'no access to congregate religious, educational, or social programming'—pose[s] a 'substantial risk' of serious psychological and emotional harm" to adult death row prisoners) (citation omitted).

> **2.    The proposed Amended Complaint contains enough circumstantial evidence for this Court, at this stage, to infer that Defendant Morton knew of and disregarded John Doe's plight.**

An official acts with deliberate indifference when they "know[] of and disregard[] an excessive risk" to the health or safety of the plaintiff. *Farmer v. Brennan*, 511 U.S. 825, 837

---

[6] The information about John Doe's childhood and diagnoses was part of his individual service plan and would have been reviewed by Defendant Morton (at a minimum) when she signed off on him being placed in solitary in the infirmary. ¶¶ 9, 79, 99.

(1994). As the Fourth Circuit has summarized, the *Farmer* standard "defines deliberate indifference as the *intentional* taking of a risk that the defendant knows *might cause harm while lacking any intent to cause such harm*." *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (emphasis in original). Because an officer's knowledge that their actions "might cause harm" "is a question of fact," it can be proven in the "usual ways" that mental states are proven, "including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. In particular, the "factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. (internal citations omitted).

The risk that John Doe's continued solitary confinement might cause harm was known to Defendant Morton. The Institutional Classification and Review Committee ("ICRC") was the administrative body responsible for John Doe's housing situation. ¶ 78. The ICRC met several times to discuss his safety plan. ¶¶ 78–84. Defendant Morton reviewed ICRC decisions in her capacity as Superintendent. ¶ 81. All ICRC agendas have a space for the "Superintendent's Disposition" on each case addressed. ¶ 81. Specifically, on or about August 10, 2023, internal documents show that Defendant Morton approved John Doe's continued confinement in the infirmary. ¶ 82. After this approval, the ICRC met at least five more times to discuss John Doe's placement. ¶¶ 83-84. Each agenda would have a place for the "Superintendent's Disposition" for each case addressed. ¶ 81.[7]

Over the next several months, John Doe frequently voiced serious concerns about his conditions of confinement to his counselor Dr. Mims. ¶ 86. Dr. Mims attended ICRC meetings in which John Doe's safety plan was discussed. ¶ 85. It is a reasonable inference at this stage that

---

[7] Plaintiff only has the agenda from two meetings related to John Doe in August 2023.

Defendant Morton, if she did not know otherwise, would have learned about John Doe's health and wellbeing concerns in her review of ICRC actions. ¶¶ 86-87.

Further, the Virginia Administrative Code contains numerous sections outlining Defendant Morton's duties as Superintendent—all of which would have put her on notice about John Doe's deteriorating condition. ¶¶ 97–104. At this stage, it is reasonable to infer that Bon Air and Superintendent Morton were following the regulations as required by state law. Accordingly, Defendant Morton would meet with key staff at least monthly, which would have included staff working in the infirmary. ¶ 100. She would have visited the infirmary once a month. ¶ 101. And she would have reviewed, or designated someone to review, on a daily basis, John Doe's continued placement in confinement. ¶¶ 102–103. It is more than a fair inference that Defendant Morton was aware that John Doe remained in solitary confinement in the infirmary.

The inference that Defendant Morton was aware that John Doe continued to be held in solitary is further supported by the widespread knowledge at Bon Air about John Doe's continued confinement in the infirmary. An outside consultant in Spring 2024, retained to address staffing issues, noted concerns about a resident being housed in the infirmary for four months for non-medical reasons. ¶¶ 92–93. The information in the report was gained from on-site observation, interviews with facility management staff and leadership (including Defendant Morton), staff focus groups, and discussions with the residents. ¶ 94. An outside consultant brought in to address a separate issue becoming aware of John Doe's plight demonstrates how common the knowledge was. Further, the consultant's method of information gathering closely mirrors what Defendant Morton was required to do pursuant to Virginia's administrative code while she was Superintendent. She was required to meet with Bon Air's department heads and staff members monthly and visit the living and activity areas at least weekly, but at a minimum monthly. ¶¶ 100–

15

101. It would have been nearly impossible for Defendant Morton to complete these requirements without becoming aware of John Doe's continued stay in solitary.

In addition to John Doe's own statements, the risks to John Doe's health were also obvious to Defendant Morton in light of widespread agreement on the harms of solitary confinement, ¶¶ 53–62, especially for juveniles and those with mental health issues. ¶ 60. The Department of Justice heeded this research a decade ago in a report recommending that restrictive housing *in adult prisons* be used sparingly "and never as a default solution" due to high risks of harm. ¶ 54. The Fourth Circuit explicitly recognized this harm in *Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022)—binding precedent that Defendant Morton likely was aware of as Superintendent of a correctional institution. It is well-documented that the harms of solitary confinement are more pronounced for youth whose brains are still developing, ¶¶ 58–59, and who enter custody with preexisting mental health conditions, ¶ 60. This research paints a general understanding that the risks posed to John Doe, by keeping him in solitary confinement for six months, as a juvenile with serious mental health conditions, were obvious.

### 3.   Because John Doe can state a claim under the Eighth Amendment, Defendant Morton is not entitled to qualified immunity at this stage.

Based on her prior motion to dismiss, Plaintiff expects that Defendant Morton will assert that she is entitled to qualified immunity and thus, even if he states a claim under the Eighth Amendment, Plaintiff's claim against her is still futile. Accordingly, Plaintiff will address here why, based on Fourth Circuit precedent, Defendant Morton is not entitled to qualified immunity.

The Fourth Circuit follows the rule that if a plaintiff has alleged sufficient facts to demonstrate deliberate indifference, the defendant cannot be awarded qualified immunity. *Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022). This is because a reasonable official who acts with deliberate indifference cannot simultaneously think their actions are lawful. *See id*. That rule

applies here. If this Court finds that Plaintiff has stated a claim under the Eighth Amendment, Defendant Morton cannot be entitled to qualified immunity at this stage. *Hammock v. Watts*, 146 F.4th 349, 364 (4th Cir. 2025). *See also Thorpe*, 37 F.4th at 934 (describing how merits and the qualified immunity analysis for deliberate indifference "effectively collapse into one") (quoting *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996)).

The affirmative defense of qualified immunity ensures that before officers are held liable, they have "notice their conduct is unlawful." *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Whether an officer has notice is a question of "whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In other words, government officials can be held liable for violations of clearly established rights because they are presumed to be aware of clearly established rights and thus on notice.

In *Thorpe v. Clarke*, the Fourth Circuit addressed how qualified immunity works in the context of the Eighth Amendment, which, unlike the Fourth Amendment, "prohibits only intentional conduct." 37 F.4th 926, 934 (4th Cir. 2022). Because qualified immunity "fundamentally concerns itself with 'fair notice,'" an officer who knowingly violates the law will not be granted immunity. *Id*. (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). Accordingly, for Eighth Amendment claims, which require a minimum mental state of deliberate indifference, "when 'plaintiffs have made a showing sufficient to' demonstrate an intentional violation of the Eighth Amendment, 'they have also made a showing sufficient to overcome any claim to qualified immunity.'" *Id*. (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001)). The merits and the qualified immunity analysis for deliberate indifference "effectively collapse into one." *Id*. (quoting *Delgado-Brunet v. Clark*, 93 F.3d 339, 345 (7th Cir. 1996)).

17

Because Plaintiff has alleged sufficient facts to demonstrate the subjective prong of Eighth Amendment deliberate indifference, Defendant Morton cannot carry her burden of demonstrating the affirmative defense of qualified immunity. *See Mays v. Sprinkle*, 992 F.3d 295, 305 (4th Cir. 2022) ("[W]e conclude that the complaint plausibly alleges that Mays had an objectively serious medical condition requiring medical attention and that the officers subjectively knew of that need and the excessive risk of their inaction. That is enough to overcome qualified immunity and survive a motion to dismiss."). The defense of "qualified immunity does 'not allow the official who actually knows that he was violating the law to escape liability for his actions.'" *Thorpe*, 37 F.4th at 933 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 821 (1982) (Brennan, J., concurring)). Defendant Morton would not be entitled to qualified immunity at this stage.

### Conclusion

For the reasons stated above, John Doe respectfully questions that this Court grant his motion to file an Amended Complaint.

Respectfully submitted,

JOHN DOE,

By:  _____ /s/ Danny Zemel
      Counsel

Danny Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:    (804) 381-4458
Email: dzemel@krudys.com

Maisie Osteen (VSB #98736)
LEGAL AID JUSTICE CENTER
626 E. Broad Street, Suite 200

Richmond, VA 23219
Phone: (804) 643-1086
Fax:    (804) 643-2059
Email:  maise@justice4all.org

*Counsel for Plaintiff*

## Certificate of Service

I hereby certify that on this 20th day of April 2026, I will electronically file the foregoing

with the Clerk of the Court using the CM/ECF system, which will then send notification of such

filing to all counsel of record.

By:    /s/ Danny Zemel__
                    Counsel